## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

```
*****************************************************
```
JAMES G. PAULSEN, Regional Director of Region 29 of    *
the National Labor Relations Board, for and on behalf of    *
the NATIONAL LABOR RELATIONS BOARD    *
                                    Petitioner    *
                                                      **CV 13** *
            v.    *

ALL AMERICAN SCHOOL BUS CORP., ANJ SERVICE,    *
INC., ATLANTIC QUEENS BUS CORP., BOBBY'S BUS    *
CO. INC., BORO TRANSIT, INC., B-ALERT INC.,    *
ATLANTIC ESCORTS INC., CITY WIDE TRANSIT,    *
INC., CANAL ESCORTS, INC., CIFRA ESCORTS, INC.,    *
EMPIRE STATE ESCORTS, INC., GOTHAM BUS CO.    *
INC., GRANDPA'S BUS CO., INC., HOYT    *
TRANSPORTATION CORP., IC ESCORTS, INC.,    *
KINGS MATRON CORP., LOGAN TRANSPORTATION    
SYSTEMS, INC., LONERO TRANSIT INC., LORISSA    
BUS SERVICE INC., MOUNTAINSIDE    *
TRANSPORTATION CO., INC., PIONEER SCHOOL    *
BUS RENTAL, INC., PIONEER TRANSPORTATION    *
CORP., RAINBOW TRANSIT INC., AMBOY BUS CO.,    *
INC., RELIANT TRANSPORTATION, INC., RPM    *
SYSTEMS INC., SCHOOL DAYS INC. and TUFARO    *
TRANSIT CO. INC.    *
                                    Respondents    *
```
*****************************************************
```

**MATSUMOTO, J.**

**REYES, M.J**

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PETITION FOR PRELIMINARY INJUNCTION
## UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT

### I.    STATEMENT OF THE CASE

This proceeding is before the Court on a petition filed by the Regional Director of Region

29 of the National Labor Relations Board, here called the Board, pursuant to Section 10(j) of the

National Labor Relations Act, as amended (61 Stat. 149, 73 Stat. 544, 29 U.S.C. Sec. 160(j)),

herein called the Act. Section 10(j) of the Act provides that upon issuance of an administrative

complaint charging that a person has engaged in or is engaging in an unfair labor practice, the

1

Board may petition the district court "for appropriate preliminary relief or a restraining order." *See* 29 U.S.C. § 160(j) (1998).

Petitioner, James G. Paulsen, Regional Director of Region 29 of the Board, brings this petition against All American School Bus Corp., et al.,[1] herein called the Respondents, for, *inter alia*, a preliminary injunction pending the final disposition of the matters involved herein pending before an Administrative Law Judge based on a Consolidated Complaint that alleges, *inter alia*, that Respondents have engaged in, and are engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (5) of the Act. Section 8(a)(5) of the Act makes it unlawful for an employer to refuse to bargain collectively with the representatives of its employees.

## II.    PROCEDURAL HISTORY

On March 20 and 21, 2013, Local 1181-1061, Amalgamated Transit Union, AFL-CIO, herein called the Union, filed charges in Cases 29-CA-100827, et al.[2] against Respondents. On May 31, 2013, the Union subsequently amended certain cases.[3] The charges alleged, *inter alia*, that Respondents refused to bargain collectively and unilaterally implemented extensive changes in the terms and conditions of employment of its employees in the absence of genuine impasse.

---

[1] All American School Bus Corp.; ANJ Service, Inc.; Atlantic Queens Bus Corp., herein called Atlantic Queens; Bobby's Bus Co. Inc.; Boro Transit, Inc., herein called Boro; B-Alert Inc.; Atlantic Escorts Inc., herein called Atlantic Escorts; City Wide Transit, Inc., Canal Escorts, Inc.; CIFRA Escorts, Inc.; Empire State Escorts, Inc.; Gotham Bus Co. Inc., herein called Gotham; Grandpa's Bus Co., Inc.; Hoyt Transportation Corp.; IC Escorts, Inc.; Kings Matron Corp.; Logan Transportation Systems, Inc.; Lonero Transit Inc., herein called Lonero; Lorissa Bus Service Inc.; Mountainside Transportation Co., Inc., herein called Mountainside; Pioneer School Bus Rental, Inc., herein called Pioneer School Bus Rental; Pioneer Transportation Corp., herein called Pioneer Transportation; Rainbow Transit Inc.; Amboy Bus Co., Inc.; Reliant Transportation, Inc., herein called Reliant; RPM Systems Inc.; School Days Inc. and Tufaro Transit Co. Inc.

[2] Cases 29-CA-100827, 100830, 100833, 100862, 100863, 100864, 100865, 100874, 100876, 100879, 100885, 100887, 100892, 100895, 100899, 100914, 100916, 100918, 100920, 100923, 100926, 100930, 100933, 100935, 100961, 100962, 100966, 100967, 100969, 101009, 101013, 101014, 101019, 101030, 101033, 101036, 101069, 101072, 101073, 101083, 101084, 101087, 101089, 101092, 101096, 101101, 101105, 101108, 101110, 101111, 101139, 101146, 101153,101155, 101158 and 101161.

[3] Cases 29-CA-100827, 100830, 100833, 100862, 100863, 100864, 100865, 100874, 100876, 100879, 100885, 100887, 100892, 100895, 100914, 100916, 100918, 100920, 100923, 100926, 100930, 100933, 100935, 100961, 100962, 100966, 100967 and 100969.

On June 10, 2013, the Regional Director for Region 29 issued a Consolidated Complaint and Notice of Hearing alleging, *inter alia*, that Respondent has engaged in, and is engaging in unfair labor practices within the meaning of Section 8(a)(1) and (5) of the Act. On June 20, 2013, the Regional Director for Region 29 issued an amendment to the Consolidated Complaint. A hearing before an Administrative Law Judge is scheduled to commence on July 22, 2013.

## III.    STATEMENT OF THE FACTS[4]

The New York City Department of Education, herein called DOE, contracts with transportation providers for school bus services, including the Respondents. (Ex. B2.)[5] The Union represents drivers, shop employees and matron-attendant escorts working for Respondents. (Ex. J.) Respondents are not part of a multi-employer bargaining unit; the Union signs separate but identical collective bargaining agreements, herein called CBAs, with each Respondent. (Ex. C.) However, the Respondents bargain together, submit one proposal and are represented for bargaining purposes by the same attorney, Jeffrey Pollack. (Ex. B2.)

### A. The Parties Hold Twelve Bargaining Sessions

The parties began meeting to bargain for a successor CBA in October 2012 since the existing CBA was set to expire on December 31, 2012. (*Id.*) However, very little movement occurred in the first five to six sessions because of the issue over the Employee Protection Provision[6], herein called the EPP, and because of the strike over the EPP issue, which ran from January 16, 2013 through February 15, 2013. (*Id.*)

---

[4] All facts adduced from affidavits and documents from the investigation of Cases 29-CA-100827, et al.

[5] "Ex." denotes exhibits attached to the Petition for Preliminary Injunction under 10(j) of the Act.

[6] In 1979 a settlement of a lawsuit that ended a three-month bus strike required the DOE to include EPPs in the 1979 contracts for general and special education transportation work. The EPPs established a seniority list of employees who were laid off due to an operator's loss of a contract and required operators to hire from that list and to pay employees their previous wages and pension benefits. The DOE included EPPs in all bid contracts subsequent to 1979. On December 21, 2012, Mayor of New York City, Michael Bloomberg, announced that the DOE was no longer including EPPs in its bids and by January 8, 2013, the DOE issued bids without the EPP.

### 1. The Parties Met for Their 8th and 9th Bargaining Sessions on February 26, 2013 and March 5, 2013

During the eighth session, Respondents provided proposals, and the Union countered them. (*Id.*; Ex. B4.) At most sessions, Respondents stated that they needed give-backs because they were losing money. (Ex. B2.) President Cordiello said that the Union needed proof, and Atlantic Queens, Atlantic Escorts, Reliant, Gotham, Mountainside, Boro and Lonero agreed to submit to a review of certain documents, *Id.*; Ex. C., and the parties said they would work out confidentiality agreements. (Ex. B2.) President Cordiello said that the Union could move on economics when the limited financial reviews were completed. (Ex. C.) Pollack said that they needed the Most Favored Nations clause[7] to survive and President Cordiello rejected it. (*Id.*) Gatto said that he was giving the Union until March 5, 2013, "and that's it, you watch." (*Id.*)

During the ninth session on March 5, 2013, the Respondents asked why all of the limited financial reviews were not finished, and the Union said that their auditor was finishing the ones with completed confidentiality agreements, but one or two had not yet been signed. (Ex. B2.) Gatto told President Cordiello that he was not going to pay the Easter check (due to be paid on March 22) because they were going to be at impasse by that date. (*Id.*) The parties engaged in substantive bargaining.[8]

---

[7] A Most Favored Nations clause specifies that if a union grants more favorable terms to any employer than those terms already contained in the CBA, then any signatory employer may also apply those favorable terms to its unit.

[8] The following movement occurred at this session: the Union withdrew its direct deposit proposal; Respondents withdrew the proposal for different rates for van and big bus drivers; Respondents rejected the Union's proposal of five sick days, in response the Union proposed an attendance incentive bonus; Respondents clarified that they have burden of proving that employees did not report an accident but if proved, the arbitrator must terminate the employee; Respondents rejected the Union's proposal that employees receive a full day's pay for a charter run and the Union countered with 85% pay; Respondents agreed to add attendants to the "pick of runs" language; Respondents rejected the Union's proposal for adequate facilities, and the Union countered that Respondents should meet with the Union to keep the facilities to a certain level; Respondents countered the Union's proposal that any backpay owed to employees would be paid at the employees' return to work with the counter-proposal that employees would be paid when money was received from the DOE, and the Union responded that the parties needed to discuss it; Respondents rejected the Union's proposal that (1) shop stewards must accompany all employees when Respondents speak with them and that (2) shop stewards would not be assigned to routes unless it was an emergency, and in response the Union withdrew (1); Respondents agreed to pay overtime pay in the first week of the

### 2. The Parties Met for Their 10th Bargaining Session on March 11, 2013

During this session, Peter Silverman, an attorney for some of the Respondents, arrived with a confidentiality agreement which President Cordiello signed. (Ex. C.) Attorney Pollack said that if the Union did not respond to the Respondents' economic proposals by the next bargaining session, the Respondents would take it as a sign of bad faith bargaining. (*Id.*) Attorney Gilberg said that he had not seen the results of the financial reviews yet and that Attorney Pollack still owed responses to information requests. (*Id.*) Attorney Pollack said that the Respondents needed the MFN clause. (*Id.*)

The following movement occurred at this session: the Respondents proposed a three-year term with a right to a re-opener (down from four); the Respondents countered the Union's attendance bonus proposal with a full school year of perfect attendance for one sick day; the Respondents countered the Union's proposal that employees be disciplined for DOE uniform violations rather than fined with the proposal that violations for uniform items not supplied by the Respondents would not be passed to members; the Respondents agreed that the parties would meet with the Union to keep up facilities; the Respondents rejected the Union's proposal that grievants stay working until the grievance procedure is concluded and the Union added an exception for "egregious" behaviors; the Respondents countered that backpay of up to two weeks would be paid promptly and the rest paid after the DOE pays Respondents; and the Respondents countered that the no-strike clause would be waived with a 30-day written notice and opportunity to cure any failure to timely remit deductions. (Exs. B2, B4.) After bargaining, the Union met with the auditors to review the results for the Atlantic companies and Reliant. (Ex. C.)

---

Union agreed to no daily overtime, and in response the Union said it would counter when it received the results of the limited financial reviews; Respondents withdrew their proposal requiring employees work at least 90% of workdays in the month to receive holiday and school closing pay; the Respondents withdrew its proposal that they would not contribute to funds during an employee's suspension and that no seniority would accrue; and the Union withdrew its proposal that a failure to comply with an arbitration award waives the no-strike clause. (Exs. B2-B4.)

### 3.   The Parties Met for Their 11th Bargaining Session on March 12, 2013 and the Union Made an Information Request for the Costing of Respondents' Proposals

In an e-mailed letter on March 12, 2013, the Union requested calculations of the

projected savings from all of the Respondents' proposals and various information regarding how

many employees benefit currently from certain benefits.

During the 11th bargaining session, the following movement occurred: the Union

countered Respondents' previous proposals with a 1 ½ or 2 ½ year term depending on when

contracts expired; the Union countered with a 3% wage increase each year (from 3.75% increase

the first year, 4% the second, and 4% the third) and the Respondents countered with a 10% wage

reduction for drivers and 5% for attendants (from 20% for both); the Union agreed to the

Respondents' proposal that the welfare and pension benefits are calculated pro rata during the

strike, and that the employees would not be paid for February 18 or 19, 2013 if Respondents

hired back all of the employees; the Union agreed to an increase of weekly contributions of

welfare and pension benefits by employees of $5/week per year, and it agreed to a different

health care plan if the Respondents could find one with the same benefits if the Union had the

right to review and approve; the Union agreed to a one-month moratorium of welfare benefit

contributions; the Respondents agreed to pay overtime on the first day of school if the Union

agreed to no daily overtime, and the Union countered with using 10.5 hours as a regular day

(instead of 10); the Union agreed to the Respondents' proposed language requiring employees to

work the last scheduled day before a holiday/school closing and the first scheduled day after the

holiday/school closing, as long as there was an exception for medical emergencies, and it agreed

to no holiday or adjustment pay for employees on suspension, workers' compensation or

disability; the Union countered the Respondents' proposal of $10/hr with $15/hr for the non-

6

revenue rate; the Union agreed to the Respondents' proposals that employees can be required to perform dry runs during guaranteed weeks without any pay in addition, and during a non-guaranteed week, during which employees would be paid their regular hourly rate, as long as it was subject to the grievance procedure and employees were paid for such on the first paycheck of the school year; the Union countered the Respondents' proposal that those employees whose license and/or certifications expired who do not return back to work in 6 months have resigned by increasing the amount of time to 18 months; the Union agreed to the Respondents' proposal that all proposals apply to shop employees unless otherwise specified; the Union agreed to the Respondents' proposal that big bus drivers start at $14.50/hr and attendants start at $10.50 (down from $14.905 and $11.9113/$11.3233); the Union countered regarding wage accruals that there is one after five weeks and rather than no adjustment weeks, after one year employees would receive one week's pay for Christmas or Easter, and half a week of pay for both after two years; and the parties agreed to refer to matrons/escorts/attendants as attendants. (Exs. B2-B4, C.)

### 4. The Parties Met for Their 12th Bargaining Session on March 19, 2013

By the last bargaining session on March 19, 2013, only three limited financial reviews had been completed from Atlantic, Reliant and Gotham out of about nine Respondents which offered to be reviewed. (Ex. B2.) The Union did not have a chance to analyze these by this bargaining session. (*Id.*) President Cordiello asked for more bargaining dates, and Pollack said that they would look at calendars during the caucus. (Ex. C.) President Cordiello said that the Union may consider term of the agreement and re-openers if the Respondents dropped the MFN clause. (*Id.*) Attorney Pollack asked President Cordiello if he would move below zero for wages, and President Cordiello responded that he did not know at this time and the Union would have to look at the financial reviews. (*Id.*)

7

The Union presented its counter proposals: it agreed to a term re-opener if the MFN clause was removed; it countered with a 2% wage increase for the first year, 2% for the second, and 3% for the third; it agreed to the Respondents' proposal of a 3-month moratorium on benefits if there was agreement on the strike waiver, and it countered with a 50%/50% split for increases in benefits over 7%; it withdrew its charters proposal; it agreed to the employees being physically present for picking of runs if the Respondents removed the two-week notice requirement if they cannot be present, and agreed that any employee who fails to pick a run shall be assigned to a hold-down run; it withdrew its successorship proposal; it said it was open to continuing to discussing the hours of work issue; and it said it would agree to the Respondents' proposal regarding employees receiving wages only if they worked on snow days if the language stating that those employees could not receive any additional pay was removed. (Ex. B4.)

After the Union presented its counter-proposals and the parties caucused, the Respondents presented their Best and Final Offer. (Exs. B2, C, K.) Attorney Pollack said the parties were at impasse because the Union would not agree to the MFN clause. (Exs. B2, C.) Prior to this session, the Respondents never said that the MFN clause would bring the parties to impasse. (Ex. B2.) Attorney Pollack would say during bargaining sessions that the MFN clause was important, but almost all of the Respondents' representatives would tell President Cordiello in the hallway or in the lobby that it was not important to them. (*Id.*) The Union asked why the Respondents would say they were at impasse when they were moving on issues, and President Cordiello said that they could bring in a mediator. (*Id.*) The Respondents said that they requested a mediator in January, and the Union did not want one at the time. (*Id.*)

The Union asked to meet on March 21, 2013, as planned, but the Respondents said that they would not because they were at impasse and would implement on Friday, March 22, 2013.

8

(*Id.*; Ex. C.) President Cordiello asked for more dates and the Respondents denied him. (Ex. B2.) President Cordiello said he would meet with any Respondent that would continue to negotiate but no Respondent agreed. (*Id.*) Attorney Pollack handed President Cordiello a one to two page document costing their proposals in response to the March 12, 2013 request from the Union, which the Union did not have an opportunity to review prior to the Respondents' declaration of impasse. (*Id.*) President Cordiello estimated that the total time through all the bargaining sessions that the parties discussed the MFN clause was less than an hour. (*Id.*) During negotiations for the last CBA in 2010, the Union refused to agree to the MFN clause until the last day of approximately 23 bargaining sessions. (*Id.*)

### B. Respondents Implement Their Best and Final Offer on March 22, 2013

The Respondents admitted that they implemented all of the proposals in the Best and Final Offer on Friday, March 22, 2013. (Ex. D.) President Cordiello estimates that, as a group, the Respondents saved approximately $8 million by not paying the Easter adjustment checks. (Ex. C.) Other unilateral changes include: 7.5% reduction in wages for drivers, 3.75% reduction in wages for escorts, a three month moratorium on welfare contributions, elimination of wage accruals (longevity pay), no additional pay for employees who work on days that schools are closed, elimination of adjustment weeks, elimination of daily overtime and no medical or pension contributions when employees are on worker's compensation or disability. (Ex. K.)

### C. After Implementation of the Best and Final Offer, Members Are Expressing Dissatisfaction and Loss of Faith in the Union

Various employees, most of whom are shop stewards, testified to Union members' dissatisfaction and loss of faith in the Union. (Exs. F-J.) Martine Paola, an escort/matron for Boro, heard employees say that they wanted an agreement, that the Union was weak, and they asked how the Union could let Boro get away from implementing its Best and Final Offer. (*Id.*)

Other employees stated that they did not go to the Union because they were afraid that Boro would make their wages and benefits even worse. (*Id.*)

Shop Steward Frederick Sinclair, an employee of Boro who has daily contact with over three hundred employees at Boro and Lonero, heard employees say that the Union is lying to them and did not believe that the Union filed charges with the Board. (Ex. G.) Every week or every other week, the Union creates informational fliers. (*Id.*) Before implementation, members took the fliers and never made any negative comments, but, after implementation, about 40% of the employees said that they did not want the fliers, they did not believe them, they had no faith in the Union, and that the Union is weak. (*Id.*) They said that they felt that the Respondents can do whatever they want and there is nothing that the Union can do. (*Id.*)

Shop Steward Joseph Micciulli, who also works for Lonero, testified that immediately after Lonero declared impasse, employees accused the Union of making a side deal with it, not representing employees properly, selling employees out, said that the Union is not fighting hard enough, and said that they had no faith in the Union. (Ex. H.) When Shop Steward Micciulli brings Union-related employees news, employees respond by saying that they do not believe what he is telling them because they only see negative things associated with the Union. (*Id.*)

Shop Steward Mario Jean works for Reliant, and testified that immediately after it implemented, employees said that they had no faith in the Union, the Union is not helping them, and that the Union should be stronger. (Ex. I.) He heard employees talking about calling the Board and the Governor's office because they no longer had faith in the Union, and that before implementation, about 150 to 200 employees would speak with him daily regarding various issues in his capacity as Shop Steward. (*Id.*) Now, no one approaches him about issues. (*Id.*)

When he reminded employees to approach him before they approached management regarding issues, they responded that they will not because they longer have confidence in the Union. (*Id.*)

Paola and the Shop Stewards testified that prior to implementation, about 200 to 3,000 members would attend meetings, and after implementation, only about 20 to 100 members attended. (Exs. F-I.) Shop Steward Sinclair testified that he heard members say that the meetings were a waste of time, that they were getting nowhere, and they are not getting their money from the Respondents. (Ex. G.) Shop Steward Micciulli testified that he heard employees say that they did not attend meetings because they no longer believed in the Union, and that it just takes their dues and does nothing. (Ex. H.) Paola testified that she heard employees say that they did not go to meetings because they were disgusted with the Union because it let the bus contractors walk away from the bargaining table, and it let the contractors take the employees' hard earned money. (Ex. F.)

Paola and the Shop Stewards testified that members have said that they cannot pay their bills, had to go to food pantries when they had not done so in the past, were losing their homes and cars, were going bankrupt, cannot pay their rent, cannot pay their children's tuition, experienced anxiety, depression, headaches, panic attacks, fatigue, and stomach problems, and had marital strife due to stress. (Exs. F-I.) They also testified that members have said that they are afraid to strike because they are afraid of losing their jobs, wages, benefits and houses. (*Id.*)

IV.    **ARGUMENT**[9]
       **A PRELIMINARY INJUNCTION SHOULD ISSUE TO RESTRAIN
       RESPONDENTS AS THERE IS REASONABLE CAUSE TO BELIEVE THAT
       UNFAIR LABOR PRACTICES HAVE OCCURRED**

       A.    **The Statutory Scheme Under Which Injunctive Relief is Sought**

---

[9] If the Respondents raise a constitutional argument regarding the Board, it is respectfully requested the Counsel for the Petitioner be allowed to argue and brief this issue separately.

Section 10(j) of the Act[10] authorizes United States district courts to grant preliminary injunctions pending the Board's resolution of unfair labor practice proceedings. This provision reflects Congressional recognition that, because the Board's administrative proceedings are often protracted, in many instances, absent interim relief, a Respondent can accomplish its unlawful objective before being placed under any legal restraint, and thereby render a final Board order ineffectual. *See Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980); *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975) (*citing* S. Rep. No. 105 80th Cong, 1st Sess. at 8, 27 (1947), *reprinted at* I Legislative History of the Labor Management Relations Act of 1947, 414, 433 (Government Printing Office 1985)). Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. *See, e.g., Seeler*, 517 F.2d at 37-38.

In order to grant relief under Section 10(j) of the Act, the District Court in the Second Circuit must consider only two issues: (1) whether there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals" and (2) whether granting preliminary injunctive relief is "just and proper." *See Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335 (2d Cir. 1999); *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995); *Kaynard v. MMIC, Inc.*, 734 F.2d 950, 953 (2d Cir. 1984), and cases cited therein. As set forth below, both the "reasonable cause" and "just and proper" conditions are fully satisfied in the instant case.

**B.    The Reasonable Cause Standard**

---

[10] Section 10(j) [29 U.S.C. Section 160(j)] provides: The Board shall have power, upon issuance of a complaint as provided in subsection (b), charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate preliminary relief or restraining order. Upon the filing of such a petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such preliminary relief or restraining order as it deems just and proper.

In order to obtain injunctive relief pursuant to Section 10(j) of the Act, the Board must first demonstrate that there is "reasonable cause" to believe that an unfair labor practice has been committed. In determining whether there is reasonable cause to believe that the Act has been violated, the district courts may not decide the merits of the case. *See Kaynard v. Mego Corp.*, 633 F.2d 1026 (2d Cir. 1980). Rather, the court's role is limited to determining whether there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals." *Id.* at 1032, *citing McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237, 242 n.17 (2nd Cir. 1962).

The reasonable cause requirement is satisfied where the Regional Director has come forward with evidence "sufficient to spell out a likelihood of violation." *Danielson v. Joint Bd. of Coat, Suit and Allied Garment Workers' Union*, 494 F.2d 1230, 1243 (2d Cir. 1974) (internal quotations omitted). Case law plainly establishes that Petitioner's burden is minimal and requires only a very low threshold of proof. *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 748 (9th Cir. 1988). In meeting this low threshold, Petitioner is not required to conclusively show that an unfair labor practice occurred or that precedents governing the case are in perfect harmony. Instead, Petitioner must only meet a lower burden of proof - that there is "reasonable cause" to believe that an unfair labor practice has occurred. *J.R.L. Food Corp.*, 196 F.3d at 338; *Mego Corp.*, 633 F.2d at 1030; *Silverman v. Red & Tan Charters, Inc.*, 1993 WL 404146 (S.D.N.Y. Oct. 6, 1993). Similarly, the Court "need not make a final determination that the conduct in question is an unfair labor practice." *Major League Baseball*, 67 F.3d at 1059.

In making a "reasonable cause" determination, the Court should give "'appropriate deference' to the contentions of the NLRB, and should decline to grant relief only if the [Regional Director's] legal or factual premises are 'fatally flawed.'" *Major League Baseball*, 67

13

F.3d at 1059, *quoted in J.R.L. Food Corp.*, 196 F.3d at 335. The district court should not resolve contested factual issues. Conflicts in evidence and credibility resolutions are to be resolved in favor of the Regional Director. The Regional Director's version of the facts "should be given the benefit of the doubt," *Palby Lingerie*, 625 F.2d at 1051-52, n.5 (District Court should not attempt to resolve the credibility of witnesses); *Seeler*, 517 F.2d at 37, and, together with the inferences therefrom, "should be sustained if within the range of rationality." *Mego Corp.*, 633 F.2d at 1031. *See also Gottfried V. Frankel*, 818 F.2d 485, 493-94 (6th Cir. 1987) (District Court is not permitted to resolve conflicts in the evidence; respondent's attack on credibility of Board's witnesses merely establishes conflict in the evidence; *Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147, 1150-51, n.2 (D. Mass. 1983), *aff'd. per curiam* 725 F.2d 664 (1st Cir. 1983).

Similarly, on questions of law, the court "should be hospitable to the views of the Regional Director, however novel." *Danielson*, 494 F.2d at 1245, *quoted in Mego Corp.*, 633 F.2d at 1031. The Court should sustain the Regional Director's legal conclusions unless it is convinced that view is wrong. *Palby Lingerie*, 625 F.2d at 1051; *Kaynard v. Independent Routemen's Association*, 479 F.2d 1070, 1072 (2d Cir. 1973) (district court committed reversible error by not limiting itself to reasonable cause question) [Section 10(l) proceeding, which requires essentially the same analysis. *See, e.g., Danielson*, 494 F.2d at 1242.]

**B.      The "Reasonable Cause" Standard Has Been Met**

**1.  Respondents Violated Section 8(a)(1) and (5) of the Act by Prematurely Declaring Impasse and Refusing to Bargain**

The evidence in this case meets the reasonable cause standard. Section 8(d) of the Act provides that the obligation in good faith to bargain "does not compel either party to agree to a proposal or require the making of a concession" and therefore a party is not required "to engage in fruitless marathon discussions at the expense of frank statement and support" of one's

position. *NLRB v. American National Insurance Co.*, 343 U.S. 395, 404 (1952). "The Board has defined impasse as the point in time of negotiations when the parties are warranted in assuming that further bargaining would be futile . . . Both parties must believe that they are at the end of their rope." *Larsdale, Inc.*, 310 NLRB 1317, 1318 (1993); *PRC Recording Co.*, 280 NLRB 615, 635 (1986), *enfd.*, 836 F.2d 289 (7th Cir. 1987). The Board does not lightly find an impasse and the burden is on the party asserting it. *L.W.D., Inc.*, 342 NLRB 965, 965 (2004); *CalMat Co.*, 331 NLRB 1084, 1097-98 (2000); *CJC Holdings, Inc.*, 320 NLRB 1041 (1996).

Impasse is not reached if one party remains flexible on certain demands, even if the timetable was unsatisfactory to the other party. *Grinnell Fire Protection System Co.*, 328 NLRB 585 (1999). In addition, impasse on one issue does not suspend the obligation to bargain on the remaining unsettled issues. *Patric & Co.*, 238 NLRB 390 (1980), *enfd. mem.* 664 F.2d 889 (9th Cir. 1981). Impasse is synonymous with deadlock. *Tom Ryan Distributors*, 314 NLRB 600, 604-05 (1994), *enf. mem.* 70 F.3d 1272 (6th Cir. 1995).

The Board has enumerated some of the factors it takes into account in determining whether parties have reached impasse:

> Whether a bargaining impasse exists is a matter of judgment. The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, the contemporaneous understanding of the parties as to the state of negotiations are all relevant factors in deciding whether an impasse in bargaining existed.

*Taft Broadcasting Co.*, 163 NLRB 475, 478 (1969), *enfd.* 395 F.2d 622 (D.C. Cir. 1968).

Although impasse usually requires an overall deadlock in bargaining, impasse on a single critical issue can also cause such a complete breakdown in negotiations to cause impasse. *CalMat Co.*, 331 NLRB at 1098. The party asserting single-issue impasse must establish the following:

[F]irst, the actual existence of a good-faith bargaining impasse; second, that the issue as to which the parties are at impasse is a critical issue; third, that the impasse on this critical issue led to a breakdown in the overall negotiations – in short, that there can be no progress on any aspect of the negotiations until the impasse relating to the critical issue is resolved. *Id.*

The Respondents did not establish the first element of its defense: that the parties had reached good faith impasse. The Respondents' position is that because there was a deadlock regarding the MFN clause, the parties were at impasse. The parties' bargaining history shows that in their twenty-three sessions for the previous CBA, the parties agreed to the MFN clause at their last session. Here, there had only been twelve sessions, seven before or during the strike which were unproductive, which left only five productive sessions after the strike. Furthermore, only three limited financial reviews were complete by the declaration of impasse, and the Respondents had just provided a response to the Union's March 12, 2013 request for the costing of their proposals that day. In addition, the Respondents put their Best and Final Offer on the table only at the last bargaining session, and announced immediately they were at impasse and shut down further bargaining in the face of the Union's willingness to continue to bargain.

During the last two sessions, there was significant movement regarding important issues: term of the agreement, rates of pay, welfare, pick of runs and new hires. There is no evidence that the Union thought that the parties were near impasse, evidenced by their continued movement in key issues and requests for further bargaining and mediation, which were denied by the Respondents. President Cordiello testified that Gatto had stated on December 11, 2012, and February 26 and March 5, 2013, that the parties would implement their Best and Final Offer in March 2013, showing a desire to implement independent of the state of bargaining. It is important to note that the exact day that the Respondents implemented their Best and Final Offer was the day that the Easter adjustment checks were due.

16

Although there is evidence that the MFN clause was a critical issue, the Respondents did

not establish the third element of its defense: that the impasse on the MFN clause led to a

breakdown in the overall negotiations, and that there would be no progress on any aspect of until

the impasse relating to the critical issue was resolved. The Respondents did not state that the

MFN clause would bring the parties to impasse until the last bargaining session and President

Cordiello testified that the total time that the parties discussed the MFN clause was less than an

hour. The evidence shows vast movement on important issues in the last few sessions despite a

lack of agreement on the MFN clause, which was consistent with their bargaining history.

The instant case is distinguished from *New NGC, Inc.*, 359 NLRB No. 116 (2013), where

the Board found that the parties reached impasse. In that case, the union offered several

concessions regarding economic proposals but their efforts failed, and regarding retirement

proposals, the union stated that it would not accept them and they were "wrong," "shortsighted,"

self-destructive," and "an attack on the middle class." Deadlock on these issues and an analysis

of the *Taft* factors (including a history of expeditiously negotiating successive agreements, there

was nothing the union could offer to break deadlock and movement at the last session was

primarily from the union), led the Board to find that the parties reached impasse. In the instant

case, the Respondents are claiming deadlock on only one issue to which the parties agreed in the

past at the last session, and both parties made significant movement at the last few sessions.

Given the above, the evidence fails to establish that the parties had reached a good faith impasse

in negotiations when the Respondents announced that it was implementing their final offer.

   2. **Respondents Violated Section 8(a)(1) and (5) of the Act by Unilaterally
      Implementing Extensive Changes in the Terms and Conditions of
      Employment of its Employees in the Absence of Genuine Impasse**

17

Section 8(a)(5) of the Act prohibits an employer from unilaterally instituting changes regarding wages, hours and other terms and conditions of employment before reaching a valid impasse in negotiations. *NLRB v. Katz*, 369 U.S. 736 (1962); *Day Automotive Group*, 348 NLRB 1257, 1263 (2006); *Tom Ryan Distributors*, 314 NLRB 600, 604 (1994). If a good faith impasse is found to exist, an employer is free to implement changes that are reasonably comprehended within the employer's pre-impasse proposals. *Richmond Electrical Services*, 348 NLRB 1001, 1003 (2006); *CalMat Co.*, 331 NLRB 1084, 1100 (2000).

Here, there the Respondents admit that they implemented their Best and Final Offer on March 22, 2013. However, they did not establish that a good faith impasse existed prior to their implementation. Therefore, based on the above, there is reasonable cause to believe that Respondents refused to bargain collectively and unilaterally implemented extensive changes in the terms and conditions of employment of its employees in the absence of genuine impasse in violation of Section 8(a)(1) and (5) of the Act.

**C.    Preliminary Injunctive Relief is Just and Proper**

To obtain a Section 10(j) injunction, the Board must also show that the relief is "just and proper." *See MMIC, Inc.*, 734 F.2d at 953. The Second Circuit has recognized that Section 10(j) is among those "legislative provisions calling for equitable relief to prevent violations of a statute" and courts should grant interim relief "in accordance with traditional equity practice, as conditioned by the necessities of public interest which Congress, through the Act, seeks to protect." *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980). In applying these principles, the Second Circuit has found 10(j) relief to be warranted where serious and pervasive unfair labor practices would threaten the effectiveness of the Board's final remedy. *Mego Corp.*, 633 F.2d at 1034. Similarly, the court has found Section 10(j) relief to be

warranted where interim relief is the only effective means to preserve or restore the status quo as it existed prior to the commission of unfair labor practices, *Seeler*, 517 F.2d at 38, or where the passage of time might otherwise allow Respondent to accomplish its unlawful objective before being placed under legal restraint. *Palby Lingerie, Inc.*, 625 F.2d at 1055.

### 1. Irreparable Harm Is Likely Absent Injunctive Relief

### a. An Order Requiring the Respondents to Bargain in Good Faith is Crucial

First, an interim order requiring the Respondents to bargain in good faith with the Union is crucial to protect the employees' statutory rights. It is clear that the Respondents have undermined the bargaining process by prematurely declaring impasse and imposing their final offer. *See N. Am. Soccer League*, 632 F.2d at 218 (noting need for injunctive relief where employer violated bargaining obligation by unilaterally changing unit employees' employment terms). Thus, employee support for the Union will predictably erode as it is perceived as being unable to protect the employees or affect their working conditions through collective bargaining during the period that the case is pending before the Board. *See Frankl ex rel. NLRB v. HTH Corp.*, 650 F.3d 1334, 1362–63 (9th Cir. 2011); *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining . . . ."). *See also Asseo ex rel. NLRB v. Pan Am. Grain Co.*, 805 F.2d 23, 26–27 (1st Cir. 1986).

Indeed, the halt in the negotiations has already caused deep frustration and anger among the employees. By the time the Board issues its final bargaining order, it will be too late to preserve employee choice and for the Union to regain its lost support. *HTH Corp.*, 650 F.3d at 1363 ("even if the Board subsequently orders a bargaining remedy, the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same relative

19

position of the bargaining parties"); *Bloedorn ex rel. NLRB v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001). The employees predictably will shun the Union because their working conditions will have been virtually unaffected by collective bargaining for several years, and they will have little, if any, reason to support it. *See Int'l Union of Elec., Radio & Mach. Workers*, 426 F.2d at 1249 ("[w]hen the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees"). An incumbent union needs the support of the employees it represents in order to bargain effectively. *See Small v. Avanti Health Systems*, 661 F.3d 1180, 1192-93 (9th Cir. 2011).

Thus, absent an interim bargaining order remedy, meaningful collective bargaining after a final Board decision will be impossible, the Board's final bargaining order will be a nullity, and the Respondents will have permanently undermined the employees' free choice of the Union as their bargaining agent. *See Moore-Duncan ex rel. NLRB v. Horizon House Dev. Servs.*, 155 F. Supp. 2d 390, 396–97 (E.D. Pa. 2001) (court granted interim bargaining order noting that without employee support, union has little leverage and "will be hard-pressed to secure improvements in wages and benefits at the bargaining table"); *Small v. Avanti Health Systems*, 661 F.3d at 1192-93 (weakening of union over time increases the difficulty of recreating lawful bargaining relationship under an eventual Board order); *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d at 1249 (Respondent will continue to reap the benefits of its unlawful conduct even after the order to bargain "either because the [U]nion is gone or because it is too weak to bargain effectively"). On the other hand, ordering the Respondents to bargain now offers the best chance of preserving the Union's support, protecting employee rights, and maintaining the Board's remedial authority. *See Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 669 (9th Cir. 2001) ("Successful bargaining could restore the employees' interest

in the Union"). Moreover, in addition to protecting the effectiveness of a final Board bargaining order, interim bargaining will ensure that the unit employees are not deprived of the benefits of Union representation until a final Board decision, a loss that a final Board order cannot remedy. *See, e.g., HTH Corp.*, 650 F.3d at 1363 ("the Board generally does not order retroactive relief . . . to rank-and-file employees for the loss of economic benefits that might have been obtained had the Respondent bargained in good faith"); *Francisco Foods, Inc.*, 276 F.3d at 299 (final Board order "cannot fully compensate the employees . . . for the variety of benefits that good-faith collective bargaining with the Union might otherwise have secured for them in the present"); *Stephen Dunn & Assocs.*, 241 F.3d at 667.

### b. Interim Rescission of the Unilateral Changes is Necessary

Unilateral changes strike at the heart of a union's ability to represent employees by allowing a Respondent to enjoy the fruits of its unlawful conduct and gain an undue bargaining advantage. *See Herman Sausage Co.*, 122 NLRB 168, 172 (1958), *enforced*, 275 F.2d 229 (5th Cir. 1960). *See also Little Rock Downtowner, Inc.*, 168 NLRB 107, 108 (1967), *enforced*, 414 F.2d 1084 (8th Cir. 1969). Such unilateral changes must "of necessity" obstruct bargaining, contrary to congressional policy. *NLRB v. Katz*, 369 U.S. 736, 747 (1962). Unilateral action "detracts from the legitimacy of the collective bargaining process by impairing the union's ability to function effectively, and by giving the impression to members that a union is powerless." *See NLRB v. WPIX, Inc.*, 906 F.2d 898, 901 (2d Cir. 1990). Thus, interim rescission of the Respondents' unilateral changes is necessary to allow the parties to effectively engage in good faith collective bargaining while the unfair labor practice case is pending before the Board. *See Silverman ex rel. NLRB v. Major League Baseball Player Relations Comm., Inc.*, 880 F. Supp. 246, 259 (S.D.N.Y.) (injunction appropriate to "salvage some of the important bargaining

21

equality that existed" prior to violations), *aff'd*, 67 F.3d 1054 (2d Cir. 1995). *Accord Morio ex rel. NLRB v. N. Am. Soccer League*, 632 F.2d at 218. If Respondents are allowed to maintain their implemented conditions, which are considerably less favorable to employees than their previously existing terms, they will be able to use the restoration of the status quo as "bargaining bait" to force acceptance of their other bargaining proposals. *See Harrell v. American Red Cross, Heart of America Blood Services Region,* 714 F.3d 553, 558 (7th Cir. 2013) ("putting the union in the position of needing to 'bargain back' these conditions is often the Respondent's goal, thereby changing the status quo and forcing the union to bargain for previously attained rights"). *See also Florida-Texas Freight, Inc.*, 203 NLRB 509, 510 (1973), *enforced*, 489 F.2d 1275 (6th Cir. 1974). *Accord Sw. Forest Indus., Inc. v. NLRB*, 841 F.2d 270, 275 (9th Cir. 1988) (holding that the restoration of status quo ante ensures "meaningful bargaining").

Also, interim rescission is necessary to curb lost employee support for the Union caused by the adverse changes in critical terms and conditions, damage that an eventual Board order likely cannot remedy. *See Francisco Foods, Inc.*, 276 F.3d at 297-98. *Cf. NLRB v. Hardesty Co., Inc.*, 308 F.3d 859, 865 (8th Cir. 2002) (illegal changes "send the message to the employees that their union is ineffectual, impotent, and unable to effectively represent them"); *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 505 (7th Cir. 2008). If allowed to continue, the changes will severely erode the Union's "prestige and legitimacy" in the eyes of the employees. *North American Soccer League*, 632 F.2d at 218. Indeed, the changes have already caused employees to become frustrated and angry with the Union. By the time the Board issues its final order, the employees will be far less likely to continue supporting the Union after being subjected to the burdensome changes for an extended period of time. *See Pan American Grain Co., Inc.*, 805

22

F.2d at 26-27.  Thus, because employee support for the Union is necessary for meaningful

collective bargaining, the Board's final bargaining and rescission orders will be a nullity.

### 2.  The Balance of Equities Favors Injunctive Relief

The balance of equities clearly favors granting interim relief.  The costs in terms of time

and money spent on collective bargaining is a burden that falls on both parties and thus does not

defeat a request for interim bargaining order relief.  *See Stephen Dunn & Assocs.*, 241 F.3d at

669.  Further, an interim bargaining order does not last forever.  *See Seeler ex rel. NLRB v. The*

*Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) ("[T]here is nothing permanent about any

bargaining order . . . particularly an interim order which will last only until the final Board

decision.").  The bargaining order also would not compel the Respondents to agree to any

specific term or condition of employment advanced by the Union in negotiations.  Rather, it

would only require bargaining with the Union in good faith to an agreement or impasse.  *See*

*Overstreet ex rel. NLRB v. Thomas Davis Med. Ctrs., P.C.*, 9 F. Supp. 2d 1162, 1167 (D. Ariz.

1997); *Penello ex rel. NLRB v. United Mine Workers*, 88 F. Supp. 935, 943 (D.D.C. 1950).

Moreover, any agreement reached between the parties under a Section 10(j) decree can contain a

condition subsequent to take into account the possibility of the Board's ultimate refusal to grant a

final bargaining order remedy.  *See, e.g.*, *Palby Lingerie, Inc.*, 625 F.2d at 1054.

Further, there is little risk of harm to the Respondents from having to prospectively

rescind the unilateral changes. There is strong evidence that the Respondents violated the Act by

making the unilateral changes; therefore, the Board is likely to grant the same relief as sought

here and the Respondents are unlikely to suffer any harm of recovering overpayments.  Although

the Respondents claim that rescinding the changes will cause grave financial harm, including

forcing some operators to go out of business, they failed to support that contention with evidence

23

when asked to do so by the Region.[11]  Also, to the extent that rescission of the unilateral changes will place any Respondent in financial peril, the Respondents, of course, can relieve that economic burden by bargaining in good faith to an agreement or lawful impasse.

Indeed, courts routinely grant Section 10(j) injunctions that impose financial costs on a Respondent. *See Aguayo v. South Coast Refuse Corp.*, 161 LRRM 2867 (C.D. Ca. 1999) (requiring respondent to comply with terms of agreed upon contract on an interim basis); *Eisenberg v. Suburban Transit Corp.*, 112 LRRM at 2712-13 (ordering rescission of unlawful mid-contract unilateral changes even though order would cost respondent more than if it were allowed to continue its illegal actions pending the Board's final order; court "unimpressed" with respondent's claimed harm); *Davis v. Servis Equipment Co.*, 341 F. Supp. 1298, 1302 (N.D. Tex. 1972) (ordering Respondent to comply with agreed upon contract and implement the across the board wage increase contained therein on an interim basis); *Fleischut v. Burrows Paper Corp.*, 162 LRRM 2719, 2724-25 (S.D. Miss. 1999) (enjoining respondent from "(d) Failing to and refusing to bargain in good faith with the [Union] by unilaterally withholding its customary across-the-board raises to Respondent's employees in the unit…"); *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 880 F. Supp. at 261 (ordering respondents to reinstitute the unilaterally abolished salary arbitration and free agency system existing under the parties' expired labor contract); *Ahearn v. Dunkirk Ice Cream Co., Inc.*, 133 LRRM 2088 (W.D.N.Y. 1989) (interim compliance with labor contract ordered where reasonable cause existed that respondent violated the Act by abrogating that agreement); *Blyer v. Jung Sun Laundry Group Corp.*, 2010 WL 4722286 (E.D.N.Y. 2010) (ordering respondent to reinstitute the unilaterally

---

[11] This case is distinguishable from *Paulsen v. Renaissance Equity Holdings*, 849 F. Supp. 2d 335, 361-62 (E.D.N.Y. 2012), where the court refused to order the restoration of prior wage rates because of the risk of placing the Respondent in financial distress.  In this case, there is no evidence of such.

withheld health fund payments). In any event, the risk of erroneous interim relief, small in this case, is attendant in all Section 10(j) proceedings as a risk of "carrying out sound labor law policy." *See, e.g.*, *Palby Lingerie, Inc.*, 625 F.2d at 1055.

### 3. Interim Relief is in the Public Interest

Finally, the grant of preliminary injunctive relief in this case serves the public interest by ensuring that the effect of the Respondents' unfair labor practices is not permanent, by protecting the employees' right to engage in Section 7 activity, safeguarding the parties' collective-bargaining process, and preserving the Board's remedial power. *See Francisco Foods, Inc.*, 276 F.3d at 300 ("the interest at stake in a section 10(j) proceeding is 'the public interest in the integrity of the collective bargaining process' . . . . [t]hat interest is placed in jeopardy when the protracted nature of Board proceedings threatens to circumscribe the Board's ability to fully remediate unfair labor practices").

## V.    CONCLUSION

It is respectfully submitted that the evidence establishes that there is reasonable cause to believe that Respondents violated Section 8(a)(1) and (5) of the Act as alleged in the Petition and that the injunctive relief sought is "just and proper."

Dated at Brooklyn, New York, July 3, 2013.

Respectfully submitted,

Annie Hsu, Counsel for Petitioner

Erin Schaefer, Counsel for Petitioner
National Labor Relations Board, Region 29
Two MetroTech Center, Suite 5100
Brooklyn, New York 11201

25