## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| JAMES G. PAULSEN, Regional Director of Region 29 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD <br> Petitioner <br><br> v. <br><br> ALL AMERICAN SCHOOL BUS CORP., ANJ SERVICE, INC., ATLANTIC QUEENS BUS CORP., BOBBY'S BUS CO. INC., BORO TRANSIT, INC., B-ALERT INC., ATLANTIC ESCORTS INC., CITY WIDE TRANSIT, INC., CANAL ESCORTS, INC., CIFRA ESCORTS, INC., EMPIRE STATE ESCORTS, INC., GOTHAM BUS CO. INC., GRANDPA'S BUS CO., INC., HOYT TRANSPORTATION CORP., IC ESCORTS, INC., KINGS MATRON CORP., LOGAN TRANSPORTATION SYSTEMS, INC., LONERO TRANSIT INC., LORISSA BUS SERVICE INC., MOUNTAINSIDE TRANSPORTATION CO., INC., PIONEER SCHOOL BUS RENTAL, INC., PIONEER TRANSPORTATION CORP., RAINBOW TRANSIT INC., AMBOY BUS CO., INC., RELIANT TRANSPORTATION, INC., RPM SYSTEMS INC., SCHOOL DAYS INC. and TUFARO TRANSIT CO. INC. <br> Respondents | \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* | <br><br><br><br><br><br><br> 13-CV-3762 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## POST-ADMINISTRATIVE HEARING BRIEF
## IN SUPPORT OF PETITION FOR PRELIMINARY INJUNCTION
## UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT

1

## TABLE OF CONTENTS

I.  STATEMENT OF THE CASE ............................................................................................. 3

II.  STATEMENT OF THE FACTS ......................................................................................... 3

A.  BACKGROUND AND BARGAINING HISTORY ......................................................................... 3

B.  THE PARTIES HOLD TWELVE BARGAINING SESSIONS ......................................................... 4

   *1.  The Parties Met for Their First through Seventh Sessions from October 23, 2012
through February 12, 2013 ......................................................................................................... 4*

   *2.  The Parties Met for Their Eighth and Ninth Bargaining Sessions on February 26
and March 5, 2013 ...................................................................................................................... 5*

   *3.  The Parties Met for Their Tenth Bargaining Session on March 11, 2013 ................... 6*

   *4.  The Parties Met for Their Eleventh Bargaining Session on March 12, 2013 and the
Union Made an Information Request for the Costing of Respondents' Proposals ............. 7*

   *5.  The Parties Met for Their Twelfth Bargaining Session on March 19, 2013 ............... 9*

C.  RESPONDENTS IMPLEMENT THEIR BEST AND FINAL OFFER ON MARCH 22, 2013 ........ 12

D.  AFTER IMPLEMENTATION OF THE BEST AND FINAL OFFER, MEMBERS ARE
EXPRESSING DISSATISFACTION AND LOSS OF FAITH IN THE UNION ...................................... 12

III.  ARGUMENT ................................................................................................................ 16

A.  THE REASONABLE CAUSE STANDARD HAS BEEN MET ................................................... 17

   *1.  Respondents Violated Section 8(a)(1) and (5) of the Act by Prematurely Declaring
Impasse and Refusing to Bargain ........................................................................................... 19*

   *2.  Respondents Violated Section 8(a)(1) and (5) of the Act by Unilaterally
Implementing Extensive Changes in the Terms and Conditions of Employment of its
Employees in the Absence of Genuine Impasse ..................................................................... 22*

B.  PRELIMINARY INJUNCTIVE RELIEF IS JUST AND PROPER ............................................... 22

   *1.  Irreparable Harm Is Likely Absent Injunctive Relief ................................................ 23*

     *a.  An Order Requiring the Respondents to Bargain in Good Faith is Crucial ..... 23*

     *b.  Interim Rescission of the Unilateral Changes is Necessary ................................ 25*

   *2.  The Balance of Equities Favors Injunctive Relief ...................................................... 27*

   *3.  Interim Relief is in the Public Interest ........................................................................ 29*

IV.  CONCLUSION ............................................................................................................... 29

# I.   STATEMENT OF THE CASE

This proceeding is before the Court on a Petition for Preliminary Injunction under

Section 10(j) of the National Labor Relations Act, herein called the Petition, filed on July 3,

2013, by the Regional Director of Region 29 of the National Labor Relations Board, herein

called the Board.  Since the Petition was filed, a hearing before Administrative Law Judge

Raymond Green was held from July 22 through 26, and 29 through 31, 2013.

# II.   STATEMENT OF THE FACTS[1]

## A. Background and Bargaining History

The New York City Department of Education, herein called DOE, contracts with

transportation providers, including the Respondents, for school bus services.  (Tr. at 79-81.)[2]

During the collective bargaining sessions at issue, the Union represented about 8,800 drivers,

shop employees and matron-attendant escorts working for Respondents.  (GC Ex. 2; Tr. at 82-

83.[3])  The Respondents bargain together, submit one proposal and are represented for bargaining

purposes by the same attorney, Jeffrey Pollack, who was the main spokesperson at the bargaining

sessions.  (Tr. at 80, 83.)  Historically, the Union has signed separate but identical collective

bargaining agreements, herein called CBAs, with each Respondent.  (Tr. at 82.)  Michael

Cordiello, the President of the Union, was the spokesperson for the Union at the bargaining

sessions.  (Tr. at 80.)  Richard Gilberg, attorney for the Union, was present at all of the

bargaining sessions except for January 8, 2013.  (Tr. at 503-04.)

---

[1] The facts in this case were mostly undisputed.  However, in light of the "reasonable cause" standard, where conflicts in evidence and credibility resolutions are to be resolved in favor of the Regional Director, the factspresented here reflect the Regional Director's version of the events.

[2] References to the official record of the Hearing are abbreviated as follows: "GC Ex." denotes Acting General Counsel's exhibits and "Tr. at" denotes references to the transcript of the Hearing.

[3] Tr. at 83, Line 9: "880" is in error.  The number was testified to be 8,800.

About 90 to 95 percent of the Respondents have had a collective bargaining relationship with the Union since 1979. (Tr. at 81.) During negotiations for the CBA that expired in 2012, the Respondents asked for the MFN clause throughout the sessions. (Tr. at 89.) Throughout the sessions, the Unions responded negatively to the request and refused to agree to the MFN clause until the last day. (*Id.*) The Union eventually agreed to the MFN clause because it was able to secure other items that it was seeking from the Respondents. (*Id.*) Pollack and Cordiello were the chief negotiators during those sessions as well. (*Id.*)

### B. The Parties Hold Twelve Bargaining Sessions

#### 1. The Parties Met for Their First through Seventh Sessions from October 23, 2012 through February 12, 2013

The parties began meeting to bargain for a successor CBA in October 2012 since the existing CBA was set to expire on December 31, 2012. (Tr. at 96; GC Ex. 2.) However, very little movement occurred in the first seven sessions because of the issue over the Employee Protection Provision,[4] herein called the EPP, and because of the strike over the EPP issue, which ran from January 16, 2013 through February 15, 2013. (Tr. at 96-129.) If the Most Favored Nations clause,[5] herein MFN clause, was mentioned in these sessions, it was only briefly as part of proposals. (Tr. at 102, 108, 117, 119, 125, 128.) During most sessions, Respondents would state that they were losing money, and the Union would respond that they should then submit to audits of their financial records. (Tr. at 103, 107.) During the November 20, 2012 meeting, Domenic Gatto, the Chief Financial Officer, herein called CFO, for Atlantic Queens, Atlantic

---

[4] In 1979, the DOE, many of the Respondents and the Union entered into an agreement that ended a three-month bus strike which required the DOE to include EPPs in its bids for certain school busing work. (Tr. at 83.) The EPPs established a master seniority list of employees who were laid off due to an operator's loss of a contract and required operators to hire from that list and to pay employees' previous wages and pension benefits. (Tr. at 83-84.) The DOE included EPPs in all bid contracts from 1979 through 2012. (Tr. at 85.) On December 21, 2012, Mayor of New York City, Michael Bloomberg, announced that the DOE was putting out a bid on certain routes and it was no longer including EPPs in the bids. (Tr. at 87.)

[5] See Section 51 of GC Ex. 2.

Escorts and Amboy, herein called the Atlantic companies, said that the Union could see his books when he implemented his best and final offer. (Tr. at 504.)

During certain sessions, Cordiello suggested extending the CBA for a year with the MFN clause, but Pollack rejected it. (Tr. at 103-04.) During the third session on December 11, 2012, Gatto said across the bargaining table that by March 2013, bargaining would be over and the Respondents would give the Union their best and final offer. (Tr. at 106-07.)

### 2. The Parties Met for Their Eighth and Ninth Bargaining Sessions on February 26 and March 5, 2013

During the eighth session, Respondents provided proposals, and the Union countered them. (GC Ex. 12; Tr. at 129-36.) By this session, the Atlantic companies, Reliant, Mountainside and Gotham had agreed to submit to a review of certain financial documents, and the parties were working out or signing confidentiality agreements which Respondents demanded to be signed before the reviews could be commenced. (*Id*; Tr. at 136, 506.) Cordiello told Respondents that the Union could move on economics when the reviews were completed. (Tr. at 130.) The Respondents requested the MFN clause and Cordiello rejected it. (GC Ex. 12; Tr. at 132.) Gatto, CFO for the Atlantic companies, said that he was going to bargain with the Union until March 5, 2013, "and that was it, you watch." (Tr. at 507.)

During the ninth session on March 5, 2013, before the parties commenced bargaining, Gatto told Cordiello that "they" were not going to pay the Easter adjustment check, "they" were going to give the Union a best and final offer, and the parties would be at impasse by the day the check was due because they could not afford the check. (Tr. at 139-40.) In addition, during this session confidentiality agreements for the Atlantic companies were signed. (Tr. at 507.)

5

Also at the ninth session on March 5th, the following movement occurred: Respondents agreed to pay overtime in the first week if the Union agreed to the number of hours after which overtime would start accruing and the Union responded that it would provide a counter-proposal after the audits (Tr. at 140, 142); Respondents withdrew the proposal for different wage rates for van and big bus drivers (Tr. at 141); Respondents agreed to add attendants to the "pick of runs" language (*id.*); the Union withdrew its direct deposit proposal (Tr. at 142); Respondents rejected the Union's proposal of five sick days, and in response the Union proposed an attendance incentive bonus (Tr. at 140, 142); Respondents rejected the Union's proposal that employees receive a full day's pay for a charter run and the Union countered with 85% pay (Tr. at 140, 142-43); Respondents rejected the Union's proposal for adequate facilities, and the Union countered that Respondents should meet with the Union to keep the facilities to a certain level (Tr. at 141, 143); Respondents countered the Union's proposal that any backpay owed to employees would be paid at the employees' return to work with the proposal that employees would be paid when money was received from the DOE (Tr. at 141, 143); Respondents withdrew their proposal requiring that employees work at least 90% of workdays in the month to receive holiday and school closing pay (Tr. at 141-42); and the Union withdrew its proposal that a failure to comply with an arbitration award waives the no-strike clause.  (Tr. at 144.[6])  If the MFN clause was mentioned, it was mentioned only in the context of the Union responding to Respondents' proposals.  (Tr. at 148.)

### 3.  The Parties Met for Their Tenth Bargaining Session on March 11, 2013

During this session, confidentiality agreements were signed for Boro and Lonero.  (Tr. at 508.)  The following movement occurred during this session: the Respondents counter-proposed

---

[6] Tr. at 144, line 2 contains an error.  Instead of "and we with the first part of it," Cordiello testified that they "withdrew" the first part of it.

to the Union's proposal that wage increases to new hires be increased by 4% with the proposal

that the increases be one-third of CPI, maximum two percent (Tr. at 151); the Respondents

countered the Union's attendance bonus proposal with a full school year of perfect attendance for

one sick day (*id.*); the Respondents countered the Union's proposal that employees be disciplined

for DOE uniform violations rather than fined with the proposal that violations for uniform items

not supplied by the Respondents would not be passed to members (Tr. at 152); the Respondents

agreed that the parties would meet with the Union to keep up facilities (*id.*); the Respondents

countered that backpay of up to two weeks would be paid promptly and the rest paid after the

DOE pays Respondents (*id.*); and the Respondents countered the Union's proposal of an eight-

hour minimum for dry runs with a four-hour minimum. (Tr. at 153.)  After bargaining, the

Union met with the auditors to review the results for the Atlantic companies, Reliant and

Gotham. (Tr. at 153-54.)  The MFN clause was mentioned only in the response that was given

by the Respondents in their counter to the Union's proposal that there be no MFN clause. (Tr. at

155-56.)

### 4. The Parties Met for Their Eleventh Bargaining Session on March 12, 2013 and the Union Made an Information Request for the Costing of Respondents' Proposals

In a letter dated March 12, 2013, the Union requested calculations of the projected

savings from all of Respondents' proposals and information regarding how many employees

benefit currently from certain benefits. (GC Ex. 17.)

During the eleventh session, the following movement occurred: the Union countered

Respondents' previous proposals with a 1½ or 2½ year term depending on when contracts

expired (Tr. at 159); the Union countered Respondents' wage proposal of a 14% wage reduction

with a 3% wage increase each year (from 3.75% increase the first year, 4% the second, and 4%

the third) and the Respondents countered with a 10% wage reduction for drivers and 5% for attendants (GC Ex. 18; Tr. at 159, 164); the Union agreed to the Respondents' proposal that the welfare and pension benefits should be calculated pro rata during the strike if Respondents hired back all of the employees (Tr. at 159); the Union agreed to an increase of weekly contributions of welfare and pension benefits by employees of $5/week per year (Tr. at 160); the Union agreed to a one-month moratorium of welfare benefit contributions (*id.*); the Union countered Respondents' proposal of eliminating daily overtime with using 10.5 hours as a regular day instead of the current 10 (GC Ex. 18; Tr. at 161); the Union agreed to the Respondents' proposed language requiring employees to work the last scheduled day before a holiday/school closing and the first scheduled day after the holiday/school closing, as long as there was an exception for medical emergencies, and it agreed to no holiday or adjustment pay for employees on suspension, workers' compensation or disability (Tr. at 161); the Union countered the Respondents' proposal of $10/hr with $15/hr for the non-revenue rate (Tr. at 162); the Union agreed to the Respondents' proposal that employees could be required to perform dry runs during guaranteed weeks without any additional pay, and to a four-hour guarantee if the payment was made on the first paycheck of the school year (*id.*); the Union countered the Respondents' proposal that those employees whose license and/or certifications expired who do not return back to work in 6 months have resigned by increasing the amount of time to 18 months (GC Ex. 18; Tr. at 162); the Union agreed to the Respondents' proposal that all proposals apply to shop employees unless otherwise specified (Tr. at 163); the Union agreed to the Respondents' proposal that big bus drivers start at $14.50/hr and attendants start at $10.50 but countered $13.90/hr for van drivers (to Respondents' $11.50) (GC Ex. 18; Tr. at 166[7]); the Union

---

[7] Tr. at 166, line 16 states "$4.50" in error. Cordiello testified to $14.50.

countered regarding wage accruals[8] that there is one after five years and two after ten years, and rather than no adjustment weeks[9], after one year employees would receive one week's pay for Christmas or Easter, and half a week of pay for both after two years (Tr. at 166); and the Respondents withdrew their proposals on the no strike clause, 10(A) regarding loss of work, and non-revenue rate, which was a proposal that employees would earn a lesser rate for work outside of their route. (Tr. at 100, 165-66; GC Ex. 18.)

### 5. The Parties Met for Their Twelfth Bargaining Session on March 19, 2013

Cordiello opened the bargaining session by urging the Respondents to continue negotiating, and not to take away the Easter adjustment check,[10] as was rumored. (Tr. at 169.) Then, Cordiello asked for more bargaining dates, and Pollack said that they would look at calendars during the caucus. (Tr. at 171, 510.) By this session, the only financial reviews that the auditors had completed were from the Atlantic companies, Reliant and Gotham, and the Union did not have a chance to analyze these fully by this bargaining session. (Tr. at 153-54, 172.) Cordiello testified that he said at the table that he believed that the parties could reach an agreement in light of the movement over the last two or three sessions compared to the sessions before that. (Tr. at 172.) He testified that he was "very confident" that if the parties worked together, they could reach an agreement. (*Id.*)

The following movement occurred at this session from the Union: it said it would consider a re-opener if the Respondents dropped the MFN clause (*id.*); it countered with a 2% wage increase for the first year, 2% for the second, and 3% for the third (*id.*); and it countered with a 50%/50% split for increases in benefits over 7% in response to the Respondents' proposal

---

[8] See GC Ex. 2, Section 18.
[9] See GC Ex. 2, Section 15.
[10] *Id.*

9

of 5% (Tr. at 172-73); it asked for clarification regarding overtime for employees with routes that are far away from Respondents' facilities which results in a large span of non-driving hours for the employees (Tr. at 173); it agreed to the employees being physically present for picking of runs if the Respondents removed the two-week notice requirement if they cannot be present (*id.*); it agreed that employees would not receive additional pay during snow days (Tr. at 175); and it withdrew its charters and successorship proposals (*id.*).

After the Union presented its counter-proposals and the parties caucused, the Respondents presented their Best and Final Offer. (Tr. at 176, 510; GC Ex. 20.)  This was the first time that the Union saw this document. (Tr. at 176-77, 513.)  Pollack said the parties were at impasse because the Union would not agree to the MFN clause and that the Respondents would be implementing their Best and Final Offer on March 22, 2013, and the wage reduction would go into effect on April 15, 2013. (Tr. at 179, 511.)  Prior to this session, the Respondents never said that the MFN clause would bring the parties to impasse. (*Id.*)  Although Pollack would say during bargaining sessions that the MFN clause was important, almost all of the Respondents' representatives except for Gatto and Neil Strahl, the President of Pioneer Transportation, told Cordiello in the hallway and/or lobby during negotiations and in his office that the MFN clause was not a deal breaker. (Tr. at 109, 1439.)

Cordiello said that he did not believe the parties were at impasse, and that based on what had transpired over the last few days, he thought they were making progress, including that morning. (Tr. at 180, 511.)  He said that there were plenty of open issues, there were many economic issues about which the parties were still negotiating, the Union had yet to see all of the audits promised, and there were outstanding information requests. (Tr. at 511.)  He said that the parties should continue to negotiate so they could find an agreement and that there is an

agreement somewhere. (Tr. at 180.) He said that there were still issues on which the Union was

willing to move. (Tr. at 183.) Cordiello said that he was willing to negotiate with all or any of

the parties sitting across the table individually or collectively, and he was willing to meet at any

time. (Tr. at 181.) The Union asked to meet on March 21, 2013, as planned. (*Id.*) Cordiello

also said that the Union would be willing to meet with a mediator. (*Id.*)

The Respondents said that it was their Best and Final Offer, and none of the Respondents

responded to Cordiello's offer to continue to negotiate with them. (*Id.*) The Respondents said

that they would not be meeting on March 21, 2013, that they were at impasse, and that they

would be implementing their Best and Final Offer. (*Id.*) Pollack handed Cordiello a one to two

page document costing their proposals in response to the March 12, 2013 request from the

Union, which the Union did not have an opportunity to review prior to the Respondents'

declaration of impasse. (Tr. at 181, 512-13; GC Ex. 13.) The Respondents had not produced all

of the information requested by the Union by this bargaining session. (Tr. at 181.) The Union

estimated that the total time through all the bargaining sessions that the parties discussed the

MFN clause was less than an hour. (Tr. at 181, 513.) Union attorney Gilberg testified that,

before this day, he did not hear anyone representing the Respondents discuss the MFN clause in

the context of impasse. (Tr. at 513.) The Union did not believe that the parties were at impasse

because the parties were making movement on all of the major issues such as wages and

benefits, there were many items open and withdrawn, and agreements made. (Tr. at 181-82,

514.) On other issues, the parties were moving to the middle. (Tr. at 181.) The Union was still

revising proposals in response to the information the Respondents provided it. (Tr. at 182.)

Gilberg testified that the parties spent far more time talking about various economic proposals,

wage cuts, benefit cuts, overtime, wage accruals, wage adjustments, than they ever talked about

11

the MFN clause. (Tr. at 514.) Cordiello believes that significant movement and bargaining did

not occur until after the strike ended on February 20, 2013. (Tr. at 182.) Finally, the Union was

willing to bargain further and expressed that desire. (Tr. at 514.)

### C. Respondents Implement Their Best and Final Offer on March 22, 2013

The Respondents admitted that they implemented all of the proposals in the Best and

Final Offer on Friday, March 22, 2013. (GC Ex. 1.) Cordiello estimates that, as a group, the

Respondents saved approximately $8 to 10 million by not paying the Easter adjustment checks.

(Tr. at 193.) Other unilateral changes include: 7.5% reduction in wages for drivers and 3.75%

reduction in wages for escorts for those employees who are at top pay, a three-month moratorium

on welfare contributions, elimination of wage accruals (longevity pay), no additional pay for

employees who work on days that schools are closed, elimination of adjustment weeks,

elimination of daily overtime and no medical or pension contributions when employees are on

worker's compensation or disability. (Tr. at 189-94; GC Ex. 20.)

### D. After Implementation of the Best and Final Offer, Members Are Expressing Dissatisfaction and Loss of Faith in the Union

Various employees, most of whom are shop stewards, testified to Union members'

dissatisfaction with and loss of faith in the Union following Respondents' implementation of the

best and final offer. (Tr. at 614-929.) Martine Paola, an escort/matron for Boro, testified that

employees were "appalled" and "very upset...that the Union let this happen to us." (Tr. at 617.)

Paola also testified that around 20 employees told her they were blaming the Union for the lack

of an agreement between the Union and Boro. (Tr. at 624.) Fellow employees have also told

Paola that the "union was weak" for allowing Boro to "take away everything." (Tr. at 625.)

Paola also testified that her own views of the Union had changed since the employer

implemented its best and final offer "and the Union couldn't do anything about it. They've always did [sic] up until now." (Tr. at 626.) Further, Paola testified that she stopped going to Union meetings, stating, "I felt like it was for nothing. And I just had no confidence in the union anymore, so I figured what kind of answers am I going to get, so that's why I didn't go to the meetings." (Tr. at 619.) Paola testified that other employees stopped attending Union meetings for the same reason. (Tr. at 619-20.) Paola also testified that while she was also upset that the Union strike did not result in getting the EPP back, her impression of the Union's strength was worse after the Employer implemented its best and final offer. (Tr. at 670-71.)

Shop Steward Joseph Micciulli, who works for Lonero,[11] testified that immediately after Lonero declared impasse, employees accused the Union of making a side deal with the Lonero, called the Union a joke, asserted that the Union was not representing employees, and began questioning why they were still paying union dues. (Tr. at 698-99.) Miccuilli testified about his shock that even some of the biggest Union supporters were questioning why the Union was not doing more. (Tr. at 743.) Since implementation, employees have also stopped reading Union-related flyers Micciulli attempts to distribute, making comments about how the Union is a joke. Micciulli testified regarding employee sentiment about the Union immediately after the strike versus immediately after the implementation. Micciulli said that employees had prepared financially for the strike, which was difficult but brought important attention to the EPP. (Tr. at 709). Conversely, Micciulli testified, that after implementation of the best and final offer employees began to question why the Union was not fighting, and their faith in the Union eroded. (Tr. at 759.) Even Micciulli, a shop steward holding an elected union position, testified that sometimes he does not believe the Union has his back. (Tr. at 759.)

---

[11] Mr. Micciulli works for Lonero although the transcript refers to his employer as "ML Transit" in error.

Micciulli also testified that he is the Sergeant-at-Arms responsible for keeping order at Union meetings. Micciulli said that employees have been rude, disrespectful, loud and obnoxious at the meetings and directing comments towards Cordiello saying that he is not doing a good job. (Tr. at 706.)  Micciulli testified that in his experience at past Union meetings, this behavior was never directed at Cordiello before implementation. (Tr. at 765.)  Micciulli testified that for the first time in his tenure as Sergeant-at-Arms he had to remove someone from a Union meeting for being out of order at a post-implementation meeting.  (Tr. at 704, 759.)

Shop Steward Mario Jean works for Reliant, and testified that immediately after implementation employees began saying that they had no faith in the Union, and employees began taking action on their own because the Union was not helping them.  (Tr. at 805.)  Jean heard employees talking about calling the Labor Board and the Governor's office because they no longer had faith in the Union.  (Tr. at 820-21.)  Further, he stated that employees have been approaching management rather than the Union to resolve work disputes related to payroll issues, starting time, Board of Education, and pull-out time.  (Tr. at 881.)  He also testified that before implementation, he would have about three or four grievance meetings a week but since implementation, the number has fallen off dramatically due to lack of faith in the Union.  (Tr. at 882.)

Jean testified that since implementation employees have reacted negatively to Union flyers he distributed, throwing them in the garbage or on the floor.  (Tr. at 805.)  Jean also testified that Union meeting attendance has dropped from 3,000 people in attendance in April to 150 in June.  (Tr. at 846-48).  Jean testified that fellow employees have expressed an unwillingness to go to Union meetings since implementation because they are upset with the Union and do not wish to go.  (Tr. at 809-10.)  Jean explained that in the past, employees would

14

ask him to arrange a bus to take employees to the Union meetings, but they have not asked him to do that since implementation of the final offer. (*Id.*) Rather than request busses to Union meetings, employees tell Jean that they do not believe in the Union anymore and see no reason to attend meetings. (Tr. at 858.)

Shop Steward Frederick Sinclair, an employee of Boro, testified that he has daily contact with over three hundred employees at Boro and Lonero. (Tr. at 905.) Sinclair testified that since implementation, employees have told him that the Union is weak and that the owners are laughing at the employees because the Union is weak and the employer can do whatever it wants to the employees. (Tr. at 902.) Sinclair also testified that employees have told him they do not even believe that the Union has filed charges with the Board. (Tr. at 903.) Sinclair further testified that around 40% of the employees he has contact with have made negative comments concerning the Union. (Tr. at 904.) He also stated that the negative comments only began after implementation of the new wages, and not before. (*Id.*) Sinclair testified that he heard members say that the meetings were a waste of time and that the meetings were nonsense. (Tr. at 903.)

Paola and the Shop Stewards also testified to the difficulty employees have had paying their bills. Micciulli testified that his salary was cut $80 per week, which means he cuts out food and gas in an effort to keep up with his bills. (Tr. at 708). Paola further pointed out that in the past, during the summer, when she does not work, she uses the summer accrual checks to pay her bills; however, she has not received her summer accrual check due to Respondents' implementation of the best and final offer. (Tr. at 617). Further, Paola and the shop stewards testified that members have said that they cannot pay their bills (Tr. at 616), were afraid of losing their homes (Tr. at 752), were going bankrupt (Tr. at 767), cannot pay their rent (Tr. at 805),

cannot pay their children's tuition (Tr. at 805), experienced anxiety (Tr. at 624), depression (Tr. at 617), and stomach problems (Tr. at 624), and had marital strife due to stress. (Tr. at 711.)

## III.    ARGUMENT

Section 10(j) of the Act[12] authorizes United States district courts to grant preliminary injunctions pending the Board's resolution of unfair labor practice proceedings. This provision reflects Congressional recognition that, because the Board's administrative proceedings are often protracted, in many instances, absent interim relief, a Respondent can accomplish its unlawful objective before being placed under any legal restraint, and thereby render a final Board order ineffectual. *See Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980); *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975) (*citing* S. Rep. No. 105 80th Cong, 1st Sess. at 8, 27 (1947), *reprinted at* I Legislative History of the Labor Management Relations Act of 1947, 414, 433 (Government Printing Office 1985)). Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. *See, e.g.*, *Seeler*, 517 F.2d at 37-38.

In order to grant relief under Section 10(j) of the Act, the District Court in the Second Circuit must consider only two issues: (1) whether there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals" and (2) whether granting preliminary injunctive relief is "just and proper." *See Silverman v. J.R.L. Food*

---

[12] Section 10(j) [29 U.S.C. Section 160(j)] provides: The Board shall have power, upon issuance of a complaint as provided in subsection (b), charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate preliminary relief or restraining order. Upon the filing of such a petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such preliminary relief or restraining order as it deems just and proper.

*Corp.*, 196 F.3d 334, 335 (2d Cir. 1999); *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995); *Kaynard v. MMIC, Inc.*, 734 F.2d 950, 953 (2d Cir. 1984), and cases cited therein. As set forth below, both the "reasonable cause" and "just and proper" conditions are fully satisfied in the instant case.

### A. The Reasonable Cause Standard Has Been Met

In order to obtain injunctive relief pursuant to Section 10(j) of the Act, the Board must first demonstrate that there is "reasonable cause" to believe that an unfair labor practice has been committed. In determining whether there is reasonable cause to believe that the Act has been violated, the district courts may not decide the merits of the case. *See Kaynard v. Mego Corp.*, 633 F.2d 1026 (2d Cir. 1980). Rather, the court's role is limited to determining whether there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals." *Id.* at 1032, *citing McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237, 242 n.17 (2d Cir. 1962).

The reasonable cause requirement is satisfied where the Regional Director has come forward with evidence "sufficient to spell out a likelihood of violation." *Danielson v. Joint Bd. of Coat, Suit and Allied Garment Workers' Union*, 494 F.2d 1230, 1243 (2d Cir. 1974) (internal quotations omitted). Case law plainly establishes that Petitioner's burden is minimal and requires only a very low threshold of proof. *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 748 (9th Cir. 1988). In meeting this low threshold, Petitioner is not required to conclusively show that an unfair labor practice occurred or that precedents governing the case are in perfect harmony. Instead, Petitioner must only meet a lower burden of proof - that there is "reasonable cause" to believe that an unfair labor practice has occurred. *J.R.L. Food Corp.*, 196 F.3d at 338; *Mego Corp.*, 633 F.2d at 1030; *Silverman v. Red & Tan Charters, Inc.*, 1993 WL

17

404146 (S.D.N.Y. Oct. 6, 1993). Similarly, the Court "need not make a final determination that the conduct in question is an unfair labor practice." *Major League Baseball*, 67 F.3d at 1059.

In making a "reasonable cause" determination, the Court should give "'appropriate deference' to the contentions of the NLRB, and should decline to grant relief only if the [Regional Director's] legal or factual premises are 'fatally flawed.'" *Major League Baseball*, 67 F.3d at 1059, *quoted in J.R.L. Food Corp.*, 196 F.3d at 335. The district court should not resolve contested factual issues. Conflicts in evidence and credibility resolutions are to be resolved in favor of the Regional Director. The Regional Director's version of the facts "should be given the benefit of the doubt," *Palby Lingerie*, 625 F.2d at 1051-52, n.5 (District Court should not attempt to resolve the credibility of witnesses); *Seeler*, 517 F.2d at 37, and, together with the inferences therefrom, "should be sustained if within the range of rationality." *Mego Corp.*, 633 F.2d at 1031. *See also Gottfried V. Frankel*, 818 F.2d 485, 493-94 (6th Cir. 1987) (District Court is not permitted to resolve conflicts in the evidence; respondent's attack on credibility of Board's witnesses merely establishes conflict in the evidence; *Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147, 1150-51, n.2 (D. Mass. 1983), *aff'd. per curiam* 725 F.2d 664 (1st Cir. 1983).

Similarly, on questions of law, the court "should be hospitable to the views of the Regional Director, however novel." *Danielson*, 494 F.2d at 1245, *quoted in Mego Corp.*, 633 F.2d at 1031. The Court should sustain the Regional Director's legal conclusions unless it is convinced that view is wrong. *Palby Lingerie*, 625 F.2d at 1051; *Kaynard v. Independent Routemen's Association*, 479 F.2d 1070, 1072 (2d Cir. 1973) (district court committed reversible error by not limiting itself to reasonable cause question) [Section 10(l) proceeding, which requires essentially the same analysis. *See, e.g., Danielson*, 494 F.2d at 1242.]

### 1. Respondents Violated Section 8(a)(1) and (5) of the Act by Prematurely Declaring Impasse and Refusing to Bargain

The evidence in this case meets the reasonable cause standard. Section 8(d) of the Act provides that the obligation in good faith to bargain "does not compel either party to agree to a proposal or require the making of a concession" and therefore a party is not required "to engage in fruitless marathon discussions at the expense of frank statement and support" of one's position. *NLRB v. American National Insurance Co.*, 343 U.S. 395, 404 (1952). "The Board has defined impasse as the point in time of negotiations when the parties are warranted in assuming that further bargaining would be futile . . . Both parties must believe that they are at the end of their rope." *Larsdale, Inc.*, 310 NLRB 1317, 1318 (1993); *PRC Recording Co.*, 280 NLRB 615, 635 (1986), *enfd.*, 836 F.2d 289 (7th Cir. 1987). The Board does not lightly find an impasse and the burden is on the party asserting it. *L.W.D., Inc.*, 342 NLRB 965, 965 (2004); *CalMat Co.*, 331 NLRB 1084, 1097-98 (2000); *CJC Holdings, Inc.*, 320 NLRB 1041 (1996).

Impasse is not reached if one party remains flexible on certain demands, even if the timetable was unsatisfactory to the other party. *Grinnell Fire Protection System Co.*, 328 NLRB 585 (1999). In addition, impasse on one issue does not suspend the obligation to bargain on the remaining unsettled issues. *Patric & Co.*, 238 NLRB 390 (1980), *enfd. mem.* 664 F.2d 889 (9th Cir. 1981). Impasse is synonymous with deadlock. *Tom Ryan Distributors*, 314 NLRB 600, 604-05 (1994), *enf. mem.* 70 F.3d 1272 (6th Cir. 1995).

The Board has enumerated some of the factors it takes into account in determining whether parties have reached impasse:

> Whether a bargaining impasse exists is a matter of judgment. The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, the

contemporaneous understanding of the parties as to the state of negotiations are all relevant factors in deciding whether an impasse in bargaining existed.

*Taft Broadcasting Co.*, 163 NLRB 475, 478 (1969), *enfd.* 395 F.2d 622 (D.C. Cir. 1968).

Although impasse usually requires an overall deadlock in bargaining, impasse on a single critical issue can also cause such a complete breakdown in negotiations to cause impasse. *CalMat Co.*, 331 NLRB at 1098. The party asserting single-issue impasse must establish the following:

> [F]irst, the actual existence of a good-faith bargaining impasse; second, that the issue as to which the parties are at impasse is a critical issue; third, that the impasse on this critical issue led to a breakdown in the overall negotiations – in short, that there can be no progress on any aspect of the negotiations until the impasse relating to the critical issue is resolved. *Id.*

The Respondents did not establish the first element of its defense: that the parties had reached good faith impasse. The Respondents' position is that because there was a deadlock regarding the MFN clause, the parties were at impasse. The parties' bargaining history shows that in their negotiations for the previous CBA, the parties agreed to the MFN clause at their last session. Here, there had only been twelve sessions, seven before or during the strike which were unproductive, which left only five productive sessions after the strike. Furthermore, only five limited financial reviews were complete by the declaration of impasse, and the Respondents had just provided a response to the Union's March 12, 2013, request for the costing of their proposals on the day that impasse was declared, March 19. In addition, the Respondents put their Best and Final Offer on the table only at the last bargaining session, and announced immediately they were at impasse and shut down further bargaining in the face of the Union's willingness to continue to bargain.

During the last two sessions, there was significant movement regarding important issues: term of the agreement, rates of pay, welfare, pick of runs and new hires. There is no evidence that the Union thought that the parties were near impasse, evidenced by their continued movement on key issues and requests for further bargaining and mediation, which were denied by the Respondents. President Cordiello testified that Gatto had stated on December 11, 2012, February 26 and March 5, 2013, that the parties would implement their Best and Final Offer in March 2013, showing a desire to implement independent of the state of bargaining. It is important to note that the exact day that the Respondents implemented their Best and Final Offer was the day that the Easter adjustment checks were due.

Although there is evidence that the MFN clause was a critical issue, the Respondents did not establish the third element of its defense: that the impasse on the MFN clause led to a breakdown in the overall negotiations, and that there would be no progress on any aspect of until the impasse relating to the critical issue was resolved. The Respondents did not state that the MFN clause would bring the parties to impasse until the last bargaining session and Cordiello and Gilberg testified that the total time that the parties discussed the MFN clause was less than an hour. The evidence shows vast movement on important issues in the last few sessions despite a lack of agreement on the MFN clause, which was consistent with their bargaining history.

The instant case is distinguished from *New NGC, Inc.*, 359 NLRB No. 116 (2013), where the Board found that the parties reached impasse. In that case, the union offered several concessions regarding economic proposals but their efforts failed, and regarding retirement proposals, the union stated that it would not accept them and they were "wrong," "shortsighted," self-destructive," and "an attack on the middle class." Deadlock on these issues and an analysis of the *Taft* factors (including a history of expeditiously negotiating successive agreements, there

21

was nothing the union could offer to break deadlock and movement at the last session was primarily from the union), led the Board to find that the parties reached impasse.  In the instant case, the Respondents are claiming deadlock on only one issue to which the parties agreed in the past at the last session, and both parties made significant movement at the last few sessions. Given the above, the evidence fails to establish that the parties had reached a good faith impasse in negotiations when the Respondents announced that it was implementing their final offer.

### 2. Respondents Violated Section 8(a)(1) and (5) of the Act by Unilaterally Implementing Extensive Changes in the Terms and Conditions of Employment of its Employees in the Absence of Genuine Impasse

Section 8(a)(5) of the Act prohibits an employer from unilaterally instituting changes regarding wages, hours and other terms and conditions of employment before reaching a valid impasse in negotiations.  *NLRB v. Katz*, 369 U.S. 736 (1962); *Day Automotive Group*, 348 NLRB 1257, 1263 (2006); *Tom Ryan Distributors*, 314 NLRB at 604.  If a good faith impasse is found to exist, an employer is free to implement changes that are reasonably comprehended within the employer's pre-impasse proposals.  *Richmond Electrical Services*, 348 NLRB 1001, 1003 (2006); *CalMat Co.*, 331 NLRB at 1100.

Here, the Respondents admit that they implemented their Best and Final Offer on March 22, 2013.  However, they did not establish that a good faith impasse existed prior to their implementation.  Therefore, based on the above, there is reasonable cause to believe that Respondents refused to bargain collectively and unilaterally implemented extensive changes in the terms and conditions of employment of its employees in the absence of genuine impasse in violation of Section 8(a)(1) and (5) of the Act.

### B. Preliminary Injunctive Relief is Just and Proper

To obtain a Section 10(j) injunction, the Board must also show that the relief is "just and proper." *See MMIC, Inc.*, 734 F.2d at 953. The Second Circuit has recognized that Section 10(j) is among those "legislative provisions calling for equitable relief to prevent violations of a statute" and courts should grant interim relief "in accordance with traditional equity practice, as conditioned by the necessities of public interest which Congress, through the Act, seeks to protect." *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980). In applying these principles, the Second Circuit has found 10(j) relief to be warranted where serious and pervasive unfair labor practices would threaten the effectiveness of the Board's final remedy. *Mego Corp.*, 633 F.2d at 1034. Similarly, the court has found Section 10(j) relief to be warranted where interim relief is the only effective means to preserve or restore the status quo as it existed prior to the commission of unfair labor practices, *Seeler*, 517 F.2d at 38, or where the passage of time might otherwise allow Respondent to accomplish its unlawful objective before being placed under legal restraint. *Palby Lingerie, Inc.*, 625 F.2d at 1055.

### 1. Irreparable Harm Is Likely Absent Injunctive Relief

#### a. An Order Requiring the Respondents to Bargain in Good Faith is Crucial

First, an interim order requiring the Respondents to bargain in good faith with the Union is crucial to protect the employees' statutory rights. It is clear that the Respondents have undermined the bargaining process by prematurely declaring impasse and imposing their final offer. *See N. Am. Soccer League*, 632 F.2d at 218 (noting need for injunctive relief where employer violated bargaining obligation by unilaterally changing unit employees' employment terms). Thus, employee support for the Union will predictably erode as it is perceived as being unable to protect the employees or affect their working conditions through collective bargaining during the period that the case is pending before the Board. *See Frankl ex rel. NLRB v. HTH*

*Corp.*, 650 F.3d 1334, 1362–63 (9th Cir. 2011); *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining . . . ."). *See also Asseo ex rel. NLRB v. Pan Am. Grain Co.*, 805 F.2d 23, 26–27 (1st Cir. 1986).

Indeed, the halt in the negotiations has already caused deep frustration and anger among the employees. By the time the Board issues its final bargaining order, it will be too late to preserve employee choice and for the Union to regain its lost support. *HTH Corp.*, 650 F.3d at 1363 ("even if the Board subsequently orders a bargaining remedy, the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same relative position of the bargaining parties"); *Bloedorn ex rel. NLRB v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001). The employees predictably will shun the Union because their working conditions will have been virtually unaffected by collective bargaining for several years, and they will have little, if any, reason to support it. *See Int'l Union of Elec., Radio & Mach. Workers*, 426 F.2d at 1249 ("[w]hen the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees"). An incumbent union needs the support of the employees it represents in order to bargain effectively. *See Small v. Avanti Health Systems*, 661 F.3d 1180, 1192-93 (9th Cir. 2011).

Thus, absent an interim bargaining order remedy, meaningful collective bargaining after a final Board decision will be impossible, the Board's final bargaining order will be a nullity, and the Respondents will have permanently undermined the employees' free choice of the Union as their bargaining agent. *See Moore-Duncan ex rel. NLRB v. Horizon House Dev. Servs.*, 155 F. Supp. 2d 390, 396–97 (E.D. Pa. 2001) (court granted interim bargaining order noting that without employee support, union has little leverage and "will be hard-pressed to secure

24

improvements in wages and benefits at the bargaining table"); *Small v. Avanti Health Systems*, 661 F.3d at 1192-93 (weakening of union over time increases the difficulty of recreating lawful bargaining relationship under an eventual Board order); *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d at 1249 (Respondent will continue to reap the benefits of its unlawful conduct even after the order to bargain "either because the [U]nion is gone or because it is too weak to bargain effectively"). On the other hand, ordering the Respondents to bargain now offers the best chance of preserving the Union's support, protecting employee rights, and maintaining the Board's remedial authority. *See Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 669 (9th Cir. 2001) ("Successful bargaining could restore the employees' interest in the Union"). Moreover, in addition to protecting the effectiveness of a final Board bargaining order, interim bargaining will ensure that the unit employees are not deprived of the benefits of Union representation until a final Board decision, a loss that a final Board order cannot remedy. *See, e.g.*, *HTH Corp.*, 650 F.3d at 1363 ("the Board generally does not order retroactive relief . . . to rank-and-file employees for the loss of economic benefits that might have been obtained had the Respondent bargained in good faith"); *Francisco Foods, Inc.*, 276 F.3d at 299 (final Board order "cannot fully compensate the employees . . . for the variety of benefits that good-faith collective bargaining with the Union might otherwise have secured for them in the present"); *Stephen Dunn & Assocs.*, 241 F.3d at 667.

### b. Interim Rescission of the Unilateral Changes is Necessary

Unilateral changes strike at the heart of a union's ability to represent employees by allowing a Respondent to enjoy the fruits of its unlawful conduct and gain an undue bargaining advantage. *See Herman Sausage Co.*, 122 NLRB 168, 172 (1958), *enfd.*, 275 F.2d 229 (5th Cir. 1960). *See also Little Rock Downtowner, Inc.*, 168 NLRB 107, 108 (1967), *enfd.*, 414 F.2d 1084

(8th Cir. 1969). Such unilateral changes must "of necessity" obstruct bargaining, contrary to congressional policy. *NLRB v. Katz*, 369 U.S. 736, 747 (1962). Unilateral action "detracts from the legitimacy of the collective bargaining process by impairing the union's ability to function effectively, and by giving the impression to members that a union is powerless." *See NLRB v. WPIX, Inc.*, 906 F.2d 898, 901 (2d Cir. 1990). Thus, interim rescission of the Respondents' unilateral changes is necessary to allow the parties to effectively engage in good faith collective bargaining while the unfair labor practice case is pending before the Board. *See Silverman ex rel. NLRB v. Major League Baseball Player Relations Comm., Inc.*, 880 F. Supp. 246, 259 (S.D.N.Y.), *aff'd*, 67 F.3d 1054 (2d Cir. 1995) (injunction appropriate to "salvage some of the important bargaining equality that existed" prior to violations). *Accord Morio ex rel. NLRB v. N. Am. Soccer League*, 632 F.2d at 218. If Respondents are allowed to maintain their implemented conditions, which are considerably less favorable to employees than their previously existing terms, they will be able to use the restoration of the status quo as "bargaining bait" to force acceptance of their other bargaining proposals. *See Harrell v. American Red Cross, Heart of America Blood Services Region,* 714 F.3d 553, 558 (7th Cir. 2013) ("putting the union in the position of needing to 'bargain back' these conditions is often the Respondent's goal, thereby changing the status quo and forcing the union to bargain for previously attained rights"). *See also Florida-Texas Freight, Inc.*, 203 NLRB 509, 510 (1973), *enfd.*, 489 F.2d 1275 (6th Cir. 1974). *Accord Sw. Forest Indus., Inc. v. NLRB*, 841 F.2d 270, 275 (9th Cir. 1988) (holding that the restoration of status quo ante ensures "meaningful bargaining").

Also, interim rescission is necessary to curb lost employee support for the Union caused by the adverse changes in critical terms and conditions, damage that an eventual Board order likely cannot remedy. *See Francisco Foods, Inc.*, 276 F.3d at 297-98. *Cf. NLRB v. Hardesty*

26

*Co., Inc.*, 308 F.3d 859, 865 (8th Cir. 2002) (illegal changes "send the message to the employees that their union is ineffectual, impotent, and unable to effectively represent them"); *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 505 (7th Cir. 2008). If allowed to continue, the changes will severely erode the Union's "prestige and legitimacy" in the eyes of the employees. *North American Soccer League*, 632 F.2d at 218. Indeed, the changes have already caused employees to become frustrated and angry with the Union. By the time the Board issues its final order, the employees will be far less likely to continue supporting the Union after being subjected to the burdensome changes for an extended period of time. *See Pan American Grain Co., Inc.*, 805 F.2d at 26-27. Thus, because employee support for the Union is necessary for meaningful collective bargaining, the Board's final bargaining and rescission orders will be a nullity.

### 2. The Balance of Equities Favors Injunctive Relief

The balance of equities clearly favors granting interim relief. The costs in terms of time and money spent on collective bargaining is a burden that falls on both parties and thus does not defeat a request for interim bargaining order relief. *See Stephen Dunn & Assocs.*, 241 F.3d at 669. Further, an interim bargaining order does not last forever. *See Seeler ex rel. NLRB v. The Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) ("[T]here is nothing permanent about any bargaining order . . . particularly an interim order which will last only until the final Board decision."). The bargaining order also would not compel the Respondents to agree to any specific term or condition of employment advanced by the Union in negotiations. Rather, it would only require bargaining with the Union in good faith to an agreement or impasse. *See Overstreet ex rel. NLRB v. Thomas Davis Med. Ctrs., P.C.*, 9 F. Supp. 2d 1162, 1167 (D. Ariz. 1997); *Penello ex rel. NLRB v. United Mine Workers*, 88 F. Supp. 935, 943 (D.D.C. 1950). Moreover, any agreement reached between the parties under a Section 10(j) decree can contain a

condition subsequent to take into account the possibility of the Board's ultimate refusal to grant a final bargaining order remedy. *See, e.g.*, *Palby Lingerie, Inc.*, 625 F.2d at 1054.

Further, there is little risk of harm to the Respondents from having to prospectively rescind the unilateral changes. There is strong evidence that the Respondents violated the Act by making the unilateral changes; therefore, the Board is likely to grant the same relief as sought here and the Respondents are unlikely to suffer any harm of recovering overpayments. Although the Respondents claim that rescinding the changes will cause grave financial harm, including forcing some operators to go out of business, they failed to support that contention with evidence when asked to do so by the Region.[13] Also, to the extent that rescission of the unilateral changes will place any Respondent in financial peril, the Respondents, of course, can relieve that economic burden by bargaining in good faith to an agreement or lawful impasse.

Indeed, courts routinely grant Section 10(j) injunctions that impose financial costs on a Respondent. *See Aguayo v. South Coast Refuse Corp.*, 161 LRRM 2867 (C.D. Ca. 1999) (requiring respondent to comply with terms of agreed upon contract on an interim basis); *Eisenberg v. Suburban Transit Corp.*, 112 LRRM 2798, 2712-13 (D. N.J.), *affd. per curiam*, 720 F.2d 661 (3d Cir. 1983) (ordering rescission of unlawful mid-contract unilateral changes even though order would cost respondent more than if it were allowed to continue its illegal actions pending the Board's final order; court "unimpressed" with respondent's claimed harm); *Davis v. Servis Equipment Co.*, 341 F. Supp. 1298, 1302 (N.D. Tex. 1972) (ordering Respondent to comply with agreed upon contract and implement the across the board wage increase contained therein on an interim basis); *Fleischut v. Burrows Paper Corp.*, 162 LRRM 2719, 2724-25 (S.D.

---

[13] This case is distinguishable from *Paulsen v. Renaissance Equity Holdings*, 849 F. Supp. 2d 335, 361-62 (E.D.N.Y. 2012), where the court refused to order the restoration of prior wage rates because of the risk of placing the Respondent in financial distress. In this case, there is no evidence of such.

Miss. 1999) (enjoining respondent from "(d) Failing to and refusing to bargain in good faith with the [Union] by unilaterally withholding its customary across-the-board raises to Respondent's employees in the unit…"); *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 880 F. Supp. at 261 (ordering respondents to reinstitute the unilaterally abolished salary arbitration and free agency system existing under the parties' expired labor contract); *Ahearn v. Dunkirk Ice Cream Co., Inc.*, 133 LRRM 2088 (W.D.N.Y. 1989) (interim compliance with labor contract ordered where reasonable cause existed that respondent violated the Act by abrogating that agreement); *Blyer v. Jung Sun Laundry Group Corp.*, 2010 WL 4722286 (E.D.N.Y. 2010) (ordering respondent to reinstitute the unilaterally withheld health fund payments). In any event, the risk of erroneous interim relief, small in this case, is attendant in all Section 10(j) proceedings as a risk of "carrying out sound labor law policy." *See, e.g.*, *Palby Lingerie, Inc.*, 625 F.2d at 1055.

### 3. Interim Relief is in the Public Interest

Finally, the grant of preliminary injunctive relief in this case serves the public interest by ensuring that the effect of the Respondents' unfair labor practices is not permanent, by protecting the employees' right to engage in Section 7 activity, safeguarding the parties' collective-bargaining process, and preserving the Board's remedial power. *See Francisco Foods, Inc.*, 276 F.3d at 300 ("the interest at stake in a section 10(j) proceeding is 'the public interest in the integrity of the collective bargaining process' . . . . [t]hat interest is placed in jeopardy when the protracted nature of Board proceedings threatens to circumscribe the Board's ability to fully remediate unfair labor practices").

## IV.  CONCLUSION

It is respectfully submitted that the evidence establishes that there is reasonable cause to believe that Respondents violated Section 8(a)(1) and (5) of the Act as alleged in the Petition and that the injunctive relief sought is "just and proper."

Dated at Brooklyn, New York, August 5, 2013.

Respectfully submitted,

_____
Annie Hsu, Counsel for Petitioner

_____
Erin Schaefer, Counsel for Petitioner
National Labor Relations Board, Region 29
Two MetroTech Center, Suite 5100
Brooklyn, New York 11201

# TABLE OF AUTHORITIES

**Cases**

*Accord Sw. Forest Indus., Inc. v. NLRB*, 841 F.2d 270, 275 (9th Cir. 1988)................................26

*Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 748 (9th Cir. 1988) ...................17

*Aguayo v. South Coast Refuse Corp.*, 161 LRRM 2867 (C.D. Ca. 1999)......................................28

*Asseo ex rel. NLRB v. Pan Am. Grain Co.*, 805 F.2d 23, 26–27 (1st Cir. 1986) ....................24, 27

*Bloedorn ex rel. NLRB v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001) 24, 25, 26, 29

*Blyer v. Jung Sun Laundry Group Corp.*, 2010 WL 4722286 (E.D.N.Y. 2010)...........................29

*CalMat Co.*, 331 NLRB 1084, 1097-98 (2000) ......................................................................19, 22

*CJC Holdings, Inc.*, 320 NLRB 1041 (1996)...................................................................................19

*Danielson v. Joint Bd. of Coat, Suit and Allied Garment Workers' Union*, 494 F.2d 1230, 1243
   (2d Cir. 1974) ..........................................................................................................................17, 18

*Davis v. Servis Equipment Co.*, 341 F. Supp. 1298, 1302 (N.D. Tex. 1972)................................28

*Day Automotive Group*, 348 NLRB 1257, 1263 (2006) ................................................................22

*Eisenberg v. Suburban Transit Corp.*, 112 LRRM 2798, 2712-13 (D. N.J.), *affd. per curiam*, 720
   F.2d 661 (3d Cir. 1983) ................................................................................................................28

*Fleischut v. Burrows Paper Corp.*, 162 LRRM 2719, 2724-25 (S.D. Miss. 1999) ......................29

*Florida-Texas Freight, Inc.*, 203 NLRB 509, 510 (1973), *enfd.*, 489 F.2d·1275 (6th Cir. 1974).26

*Frankl ex rel. NLRB v. HTH Corp.*, 650 F.3d 1334, 1362–63 (9th Cir. 2011) ......................24, 25

*Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147, 1150-51, n.2 (D. Mass. 1983), *aff'd. per curiam*
   725 F.2d 664 (1st Cir. 1983) ........................................................................................................18

*Gottfried V. Frankel*, 818 F.2d 485, 493-94 (6th Cir. 1987).........................................................18

*Grinnell Fire Protection System Co.*, 328 NLRB 585 (1999).......................................................19

*Harrell v. American Red Cross, Heart of America Blood Services Region,* 714 F.3d 553, 558 (7th
   Cir. 2013)......................................................................................................................................26

*Herman Sausage Co.*, 122 NLRB 168, 172 (1958), *enfd.*, 275 F.2d 229 (5th Cir. 1960).............25

*Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970).24,
   25

*Kaynard v. Independent Routemen's Association*, 479 F.2d 1070, 1072 (2d Cir. 1973)..............18

*Kaynard v. Mego Corp.*, 633 F.2d 1026 (2d Cir. 1980).....................................................17, 18, 23

*Kaynard v. MMIC, Inc.*, 734 F.2d 950, 953 (2d Cir. 1984) .....................................................17, 23

*Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980) ..................................passim

*L.W.D., Inc.*, 342 NLRB 965, 965 (2004 ......................................................................................19

*Larsdale, Inc.*, 310 NLRB 1317, 1318 (1993) ..............................................................................19

*Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 505 (7th Cir. 2008) ...................................27

*Little Rock Downtowner, Inc.*, 168 NLRB 107, 108 (1967), *enfd.*, 414 F.2d 1084 (8th Cir. 1969)
   ......................................................................................................................................................26

*McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237,
   242 n.17 (2d Cir. 1962) ................................................................................................................17

*Moore-Duncan ex rel. NLRB v. Horizon House Dev. Servs.*, 155 F. Supp. 2d 390, 396–97 (E.D.
   Pa. 2001)........................................................................................................................................24

*Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980)....................23, 26, 27

*New NGC, Inc.*, 359 NLRB No. 116 (2013) ..................................................................................21

*NLRB v. American National Insurance Co.*, 343 U.S. 395, 404 (1952 ......................................... 19

*NLRB v. Hardesty Co., Inc.*, 308 F.3d 859, 865 (8th Cir. 2002) .................................................. 27

*NLRB v. Katz*, 369 U.S. 736 (1962) ............................................................................................... 22

*NLRB v. Katz*, 369 U.S. 736, 747 (1962) ...................................................................................... 26

*NLRB v. WPIX, Inc.*, 906 F.2d 898, 901 (2d Cir. 1990) ............................................................... 26

*Overstreet ex rel. NLRB v. Thomas Davis Med. Ctrs., P.C.*, 9 F. Supp. 2d 1162, 1167 (D. Ariz. 1997) .......................................................................................................................................... 27

*Patric & Co.*, 238 NLRB 390 (1980), *enfd. mem.* 664 F.2d 889 (9th Cir. 1981) .......................... 19

*Penello ex rel. NLRB v. United Mine Workers*, 88 F. Supp. 935, 943 (D.D.C. 1950) ................. 27

*PRC Recording Co.*, 280 NLRB 615, 635 (1986), *enfd.*, 836 F.2d 289 (7th Cir. 1987) ............... 19

*Richmond Electrical Services*, 348 NLRB 1001, 1003 (2006) ...................................................... 22

*Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 669 (9th Cir. 2001) .............. 25, 27

*Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975) ..................................... 16, 18, 23

*Silverman ex rel. NLRB v. Major League Baseball Player Relations Comm., Inc.*, 880 F. Supp. 246, 259 (S.D.N.Y.), *aff'd*, 67 F.3d 1054 (2d Cir. 1995) ................................................... 26, 29

*Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335 (2d Cir. 1999) ....................................... 17, 18

*Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995) .................................................................................................................................... 17, 18

*Silverman v. Red & Tan Charters, Inc.*, 1993 WL 404146 (S.D.N.Y. Oct. 6, 1993) ................... 18

*Small v. Avanti Health Systems*, 661 F.3d 1180, 1192-93 (9th Cir. 2011) .............................. 24, 25

*Taft Broadcasting Co.*, 163 NLRB 475, 478 (1969), *enfd.* 395 F.2d 622 (D.C. Cir. 1968) .......... 20

*Tom Ryan Distributors*, 314 NLRB 600, 604-05 (1994), *enf. mem.* 70 F.3d 1272 (6th Cir. 1995) ................................................................................................................................................... 19, 22